TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT #2, Ltd., et al.,[1] Petitioners *v*. Commissioner of Internal Revenue, Respondent

Docket Nos. 29995–11, 30001–11,     Filed February 26, 2015.
682–12, 1082–12,
1175–12, 1180–12,
1533–12.

P received a Notice of Determination Concerning Worker Classification and corresponding employment tax liabilities on

---

[1] Cases of the following petitioners are consolidated herewith: TFT Gal-

its own behalf and other such notices as successor in interest to various partnerships. The parties dispute whether P was a successor in interest under Texas law, and R asserts this Court should establish a Federal standard of successor in interest as Federal common law. In addition, the status of P's workers for the period involving P is itself at issue. *Held*: On the facts before us, P was not a successor in interest under Texas law. *Held*, *further*, we do not adopt a Federal common law standard of successor in interest. *Held*, *further*, P's workers were employees.

*Gary I. Currier*, for petitioners.
*Jeremy H. Fetter* and *Jason D. Laseter*, for respondent.

GOEKE, *Judge*: These consolidated cases[2] are before us on petitions for redetermination of employment status filed pursuant to section 7436.[3] In separate Notices of Determination Concerning Worker Classification (notices) respondent determined that for purposes of Federal employment taxes, the individuals listed in Table 1 attached to the notices should be legally classified as petitioners' employees and thus determined deficiencies in, additions to, and penalties with respect to petitioner's Federal employment taxes as follows:[4]

---

veston Portfolio, Ltd., Successor in Interest to TFT #1, Ltd., docket No. 30001–11; TFT Galveston Portfolio, Ltd., Successor in Interest to TFT #4, Ltd., docket No. 682–12; TFT Galveston Portfolio, Ltd., docket No. 1082–12; TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT Chateau Lafitte-WJT, Ltd., docket No. 1175–12; TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT Somerset-WJT, Ltd., docket No. 1180–12; and TFT Galveston Portfolio, Ltd., as Successor in Interest to TFT #3, Ltd., docket No. 1533–12.

[2] We refer to TFT Galveston Portfolio, Ltd., as petitioner or TFT Galveston Portfolio when referencing docket No. 1082–12 alone regarding worker classification for the fourth quarter of 2004 and successor in interest. We refer to the partnerships named in the other consolidated cases as petitioners when referencing docket Nos. 29995–11, 30001–11, 682–12, 1175–12, 1180–12, and 1533–12 regarding worker classification.

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the period at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[4] In this case, the Court uses the term "employment taxes" as it is defined by sec. 7436(e) to refer to taxes imposed pursuant to subtitle C of the Internal Revenue Code, including taxes imposed under secs. 3402 (Federal income tax withholding), 3102 and 3111 (FICA tax), and 3301 (FUTA tax). We round all amounts to the nearest dollar.

TFT Galveston Portfolio, Ltd., docket No. 1082–12

*Additions to tax*

| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
|---|---|---|---|---|---|
| 12/31/2004 | FICA, ITW | $36,362 | $8,182 | $9,091 | $690 |
| 12/31/2004 | FUTA | 5,414 | 1,218 | 1,354 | 541 |

TFT Galveston Portfolio, Ltd., Successor in Interest to TFT #1, Ltd., docket No. 30001–11

*Additions to tax*

| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
|---|---|---|---|---|---|
| 3/31/2000 | FICA, ITW | $8,817 | $1,984 | $2,204 | $156 |
| 6/30/2000 | FICA, ITW | 7,300 | 1,642 | 1,825 | 129 |
| 9/30/2000 | FICA, ITW | 7,988 | 1,797 | 1,997 | 141 |
| 12/31/2000 | FICA, ITW | 7,926 | 1,783 | 1,981 | 140 |
| 12/31/2000 | FUTA | 2,759 | 621 | 690 | 276 |
| 3/31/2001 | FICA, ITW | 7,730 | 1,739 | 1,932 | 137 |
| 6/30/2001 | FICA, ITW | 8,287 | 1,865 | 2,072 | 146 |
| 9/30/2001 | FICA, ITW | 8,465 | 1,905 | 2,116 | 151 |
| 12/31/2001 | FICA, ITW | 7,977 | 1,795 | 1,994 | 143 |
| 12/31/2001 | FUTA | 2,349 | 528 | 587 | 235 |
| 3/31/2002 | FICA, ITW | 7,524 | 1,693 | 1,881 | 136 |
| 6/30/2002 | FICA, ITW | 7,340 | 1,652 | 1,835 | 133 |
| 9/30/2002 | FICA, ITW | 7,437 | 1,673 | 1,859 | 135 |
| 12/31/2002 | FICA, ITW | 7,615 | 1,713 | 1,904 | 138 |
| 12/31/2002 | FUTA | 2,568 | 578 | 642 | 257 |
| 3/31/2003 | FICA, ITW | 6,882 | 1,548 | 1,721 | 131 |
| 6/30/2003 | FICA, ITW | 7,121 | 1,602 | 1,780 | 135 |
| 9/30/2003 | FICA, ITW | 7,554 | 1,700 | 1,888 | 143 |
| 12/31/2003 | FICA, ITW | 7,511 | 1,690 | 1,878 | 143 |
| 12/31/2003 | FUTA | 1,865 | 420 | 466 | 187 |
| 3/31/2004 | FICA, ITW | 7,598 | 1,710 | 1,899 | 144 |
| 6/30/2004 | FICA, ITW | 7,838 | 1,763 | 1,959 | 149 |
| 9/30/2004 | FICA, ITW | 8,837 | 1,988 | 2,209 | 168 |
| 12/31/2004 | FICA, ITW | 2,837 | 638 | 709 | 54 |
| 12/31/2004 | FUTA | 1,810 | 407 | 452 | 181 |

TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT #2, Ltd., docket No. 29995–11

*Additions to tax*

| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
|---|---|---|---|---|---|
| 3/31/2000 | FICA, ITW | $17,667 | $3,975 | $4,417 | $312 |
| 6/30/2000 | FICA, ITW | 19,286 | 4,339 | 4,822 | 341 |
| 9/30/2000 | FICA, ITW | 18,009 | 4,052 | 4,502 | 318 |
| 12/31/2000 | FICA, ITW | 17,014 | 3,828 | 4,254 | 301 |
| 12/31/2000 | FUTA | 4,298 | 967 | 1,075 | 430 |
| 3/31/2001 | FICA, ITW | 17,372 | 3,909 | 4,343 | 307 |
| 6/30/2001 | FICA, ITW | 17,478 | 3,933 | 4,370 | 309 |
| 9/30/2001 | FICA, ITW | 17,459 | 3,928 | 4,365 | 312 |
| 12/31/2001 | FICA, ITW | 19,564 | 4,402 | 4,891 | 350 |

TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT #2, Ltd.,
docket No. 29995–11

|  |  |  | Additions to tax | | |
|---|---|---|---|---|---|
| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| 12/31/2001 | FUTA | 3,726 | 838 | 931 | 373 |
| 3/31/2002 | FICA, ITW | 18,301 | 4,118 | 4,575 | 331 |
| 6/30/2002 | FICA, ITW | 16,858 | 3,793 | 4,215 | 305 |
| 9/30/2002 | FICA, ITW | 20,032 | 4,507 | 5,008 | 362 |
| 12/31/2002 | FICA, ITW | 15,588 | 3,507 | 3,897 | 282 |
| 12/31/2002 | FUTA | 4,492 | 1,011 | 1,123 | 449 |
| 3/31/2003 | FICA, ITW | 9,346 | 2,103 | 2,337 | 177 |
| 12/31/2003 | FUTA | 1,438 | 324 | 359 | 144 |

TFT Galveston Portfolio, Ltd., as Successor in Interest to TFT #3, Ltd.,
docket No. 1533–12

|  |  |  | Additions to tax | | |
|---|---|---|---|---|---|
| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| 3/31/2000 | FICA, ITW | $20,126 | $4,528 | $5,032 | $356 |
| 6/30/2000 | FICA, ITW | 22,320 | 5,022 | 5,580 | 394 |
| 9/30/2000 | FICA, ITW | 27,588 | 6,207 | 6,897 | 487 |
| 12/31/2000 | FICA, ITW | 26,026 | 5,856 | 6,507 | 460 |
| 12/31/2000 | FUTA | 8,045 | 1,810 | 2,011 | 805 |
| 3/31/2001 | FICA, ITW | 21,074 | 4,742 | 5,268 | 372 |
| 6/30/2001 | FICA, ITW | 22,729 | 5,114 | 5,682 | 402 |
| 9/30/2001 | FICA, ITW | 21,677 | 4,877 | 5,419 | 387 |
| 12/31/2001 | FICA, ITW | 20,618 | 4,639 | 5,155 | 369 |
| 12/31/2001 | FUTA | 6,706 | 1,509 | 1,676 | 671 |
| 3/31/2002 | FICA, ITW | 17,384 | 3,911 | 4,346 | 314 |
| 6/30/2002 | FICA, ITW | 18,792 | 4,228 | 4,698 | 340 |
| 9/30/2002 | FICA, ITW | 19,124 | 4,303 | 4,781 | 346 |
| 12/31/2002 | FICA, ITW | 18,367 | 4,133 | 4,592 | 332 |
| 12/31/2002 | FUTA | 5,484 | 1,234 | 1,371 | 548 |
| 3/31/2003 | FICA, ITW | 14,287 | 3,215 | 3,572 | 271 |
| 6/30/2003 | FICA, ITW | 14,715 | 3,311 | 3,677 | 279 |
| 9/30/2003 | FICA, ITW | 14,957 | 3,365 | 3,739 | 284 |
| 12/31/2003 | FICA, ITW | 14,603 | 3,286 | 3,651 | 277 |
| 12/31/2003 | FUTA | 4,968 | 1,118 | 1,242 | 497 |
| 3/31/2004 | FICA, ITW | 11,271 | 2,536 | 2,818 | 214 |
| 6/30/2004 | FICA, ITW | 11,713 | 2,635 | 2,928 | 222 |
| 9/30/2004 | FICA, ITW | 20,189 | 4,543 | 5,047 | 383 |
| 12/31/2004 | FICA, ITW | 6,874 | 1,547 | 1,718 | 130 |
| 12/31/2004 | FUTA | 5,230 | 1,177 | 1,308 | 523 |

TFT Galveston Portfolio, Ltd., Successor in Interest to TFT #4, Ltd.,
docket No. 682–12

|  |  |  | Additions to tax | | |
|---|---|---|---|---|---|
| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| 3/31/2000 | FICA, ITW | $14,136 | $3,181 | $3,534 | $250 |
| 6/30/2000 | FICA, ITW | 19,532 | 4,395 | 4,883 | 345 |

TFT Galveston Portfolio, Ltd., Successor in Interest to TFT #4, Ltd.,
docket No. 682–12

|  |  |  | Additions to tax | | |
| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| --- | --- | --- | --- | --- | --- |
| 9/30/2000 | FICA, ITW | 14,889 | 3,350 | 3,722 | 263 |
| 12/31/2000 | FICA, ITW | 14,755 | 3,320 | 3,689 | 261 |
| 12/31/2000 | FUTA | 4,400 | 990 | 1,100 | 440 |
| 3/31/2001 | FICA, ITW | 11,724 | 2,368 | 2,931 | 207 |
| 6/30/2001 | FICA, ITW | 13,868 | 3,120 | 3,467 | 245 |
| 9/30/2001 | FICA, ITW | 11,202 | 2,520 | 2,800 | 200 |
| 12/31/2001 | FICA, ITW | 10,913 | 2,455 | 2,728 | 195 |
| 12/31/2001 | FUTA | 3,752 | 844 | 938 | 375 |
| 3/31/2002 | FICA, ITW | 10,185 | 2,292 | 2,546 | 184 |
| 6/30/2002 | FICA, ITW | 10,675 | 2,402 | 2,669 | 193 |
| 9/30/2002 | FICA, ITW | 8,655 | 1,947 | 2,164 | 157 |
| 12/31/2002 | FICA, ITW | 9,981 | 2,246 | 2,495 | 181 |
| 12/31/2002 | FUTA | 3,395 | 764 | 849 | 340 |
| 3/31/2003 | FICA, ITW | 5,437 | 1,223 | 1,359 | 103 |
| 12/31/2003 | FUTA | 837 | 188 | 209 | 84 |

TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT Chateau
Lafitte-WJT., Ltd., docket No. 1175–12

|  |  |  | Additions to tax | | |
| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| --- | --- | --- | --- | --- | --- |
| 3/31/2003 | FICA, ITW | $4,662 | $1,049 | $1,165 | $88 |
| 6/30/2003 | FICA, ITW | 15,803 | 3,556 | 3,951 | 300 |
| 9/30/2003 | FICA, ITW | 16,266 | 3,660 | 4,067 | 309 |
| 12/31/2003 | FICA, ITW | 14,196 | 3,194 | 3,549 | 269 |
| 12/31/2003 | FUTA | 3,727 | 839 | 932 | 373 |
| 3/31/2004 | FICA, ITW | 12,906 | 2,904 | 3,227 | 245 |
| 6/30/2004 | FICA, ITW | 14,503 | 3,263 | 3,626 | 275 |
| 9/30/2004 | FICA, ITW | 13,267 | 2,985 | 3,317 | 252 |
| 12/31/2004 | FICA, ITW | 4,402 | 991 | 1,101 | 84 |
| 12/31/2004 | FUTA | 2,754 | 620 | 689 | 275 |

TFT Galveston Portfolio, Ltd., as Successor in Interest for TFT Somerset-
WJT., Ltd., docket No. 1180–12

|  |  |  | Additions to tax | | |
| Period ended | Type of tax | Amount | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty sec. 6656 |
| --- | --- | --- | --- | --- | --- |
| 3/31/2003 | FICA, ITW | $2,475 | $557 | $619 | $47 |
| 6/30/2003 | FICA, ITW | 8,721 | 1,962 | 2,180 | 166 |
| 9/30/2003 | FICA, ITW | 8,997 | 2,024 | 2,249 | 171 |
| 12/31/2003 | FICA, ITW | 8,007 | 1,802 | 2,002 | 152 |
| 12/31/2003 | FUTA | 3,034 | 683 | 758 | 303 |
| 3/31/2004 | FICA, ITW | 8,124 | 1,828 | 2,031 | 154 |
| 6/30/2004 | FICA, ITW | 8,149 | 1,833 | 2,037 | 155 |
| 9/30/2004 | FICA, ITW | 9,047 | 2,036 | 2,262 | 172 |
| 12/31/2004 | FICA, ITW | 3,303 | 743 | 826 | 63 |
| 12/31/2004 | FUTA | 3,077 | 692 | 769 | 308 |

After concessions,[5] the issues for decision are: (1) whether the workers listed in the notice of determination for TFT Galveston Portfolio, Ltd.'s (TFT Galveston Portfolio) fourth quarter of the taxable year 2004 were properly classified as employees for purposes of Federal employment taxes. We hold that the identified individuals were TFT Galveston Portfolio's employees and TFT Galveston Portfolio is liable for the employment taxes determined with respect to those individuals; (2) whether, in addition to being liable for employment taxes for the fourth quarter of taxable year 2004, TFT Galveston Portfolio is liable for the Federal employment taxes, additions to tax, and penalties, as a successor in interest to TFT #1, Ltd., TFT #2, Ltd., TFT #3, Ltd., TFT #4, Ltd., TFT Chateau Lafitte-WJT, Ltd., and TFT Somerset-WJT, Ltd. We hold it is not; and (3) whether TFT Galveston Portfolio is liable for additions to tax pursuant to section 6651(a)(1) and (2) and penalties pursuant to section 6656. We hold that it is so liable.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The parties' stipulations of facts are incorporated herein by this reference.

*Petitioner's Organizational Structure*

Petitioner, TFT Galveston Portfolio, and its alleged predecessors, TFT #1, Ltd. (TFT #1); TFT #2, Ltd. (TFT #2); TFT #3, Ltd. (TFT #3); TFT #4, Ltd. (TFT #4); TFT Chateau Lafitte-WJT (TFT Chateau Lafitte-WJT); and TFT Somerset-WJT (TFT Somerset-WJT), are all organized as Texas limited partnerships. At all relevant times TFT Galveston Portfolio's principal office and mailing address was in Tomball, Texas.

---

[5] TFT Galveston Portfolio concedes that it is not entitled to treatment under the Revenue Act of 1978, Pub. L. No. 95–600, sec. 530, 92 Stat. at 2885, as amended, with respect to the workers listed in any of the notices for the period at issue. Respondent concedes that the workers who performed janitorial and maid services as well as those who performed pool and fountain maintenance for the apartment complexes, along with a number of other listed workers, were not employees of petitioners during the period at issue. Consequently, our decision in docket No. 1082–12 will be entered under Rule 155.

During the period at issue TFT #1 comprised one general partner, TFT Holdings, L.L.C. (TFT Holdings), and one limited partner, Walter J. Teachworth. From January 1, 2000, through October 26, 2004, its principal business activity was the operation of The Ebbtide apartment complex. TFT #1's final Form 1065, U.S. Return of Partnership Income, reported that it was for the period January 1 through October 31, 2004. No additional Forms 1065 were filed for TFT #1 after that return. On November 1, 2006, the State of Texas canceled the certificate of limited partnership for TFT #1.

TFT #2 comprised two general partners, TFT Holdings and Hunters R. Hill, Inc., and two limited partners, Mr. Teachworth and Henry Hamman. From January 1, 2000, through February 26, 2003, its principal business activity was the operation of the Chateau Lafitte apartment complex. TFT #2's final Form 1065 reported that it was for the period January 1 through February 28, 2003. No additional Forms 1065 were filed for TFT #2 after that return. On November 1, 2006, the State of Texas canceled the certificate of limited partnership for TFT #2.

On or about February 26, 2003, Mr. Hamman sold his partnership interest in TFT #2 to Mr. Teachworth, who created TFT Chateau Lafitte-WJT to operate the Chateau Lafitte apartment complex. TFT Chateau Lafitte-WJT comprised one general partner, TFT Holdings, and one limited partner, Mr. Teachworth. From February 26, 2003, through October 26, 2004, its principal business activity was the operation of the Chateau Lafitte apartment complex. TFT Chateau Lafitte-WJT's final Form 1065 reported that it was for the period January 1 through October 31, 2004. No additional Forms 1065 were filed for TFT Chateau Lafitte-WJT after that return. On August 16, 2006, the State of Texas canceled the certificate of limited partnership for TFT Chateau Lafitte-WJT.

TFT #3 comprised one general partner, TFT Holdings, and one limited partner, Mr. Teachworth. From January 1, 2000, through October 26, 2004, its principal business activity was the operation of The Seasons Resort apartment complex. TFT #3's final Form 1065 reported that it was for the period January 1 through October 31, 2004. No additional Forms 1065 were filed for TFT #3 after that return. On November

1, 2006, the State of Texas canceled the certificate of limited partnership for TFT #3.

TFT #4 comprised two general partners, TFT Holdings and Hunters R. Hill, Inc., and two limited partners, Mr. Teachworth and Mr. Hamman. From January 1, 2000, through February 26, 2003, its principal business activity was the operation of the Somerset Retirement Village apartment complex. TFT #4's final Form 1065 reported that it was for the period January 1 through February 28, 2003. No additional Forms 1065 were filed for TFT #4 after that return. On October 27, 2004, the State of Texas canceled the certificate of limited partnership for TFT #4.

On or about February 26, 2003, Mr. Hamman sold his partnership interest in TFT #4 to Mr. Teachworth, who created TFT Somerset-WJT to operate the Somerset Retirement Village apartment complex. TFT Somerset-WJT comprised one general partner, TFT Holdings, and one limited partner, Mr. Teachworth. From February 26, 2003, through October 26, 2004, its principal business activity was the operation of the Somerset Retirement Village apartment complex. TFT Somerset-WJT's final Form 1065 reported that it was for the period January 1 through October 31, 2004. No additional Forms 1065 were filed for TFT Chateau Lafitte-WJT after that return. On August 16, 2006, the State of Texas canceled the certificate of limited partnership for TFT Somerset-WJT.

TFT Galveston Portfolio comprised one general partner, TFT Portfolio Investments, L.L.C., and one limited partner, Mr. Teachworth. On October 26, 2004, the four apartment complexes were conveyed from TFT #1, TFT Chateau Lafitte-WJT, TFT #3, and TFT Somerset-WJT, respectively, to TFT Galveston Portfolio. TFT Galveston Portfolio did not expressly assume the liabilities of the other partnerships. From October 26 through December 31, 2004, its principal business activity was the operation of The Ebbtide, Chateau Lafitte, The Seasons Resort, and Somerset Retirement Village apartment complexes (collectively, apartment properties).

During the period at issue, Mr. Teachworth was the only owner of the partnerships who was actively involved in operating the business. He signed numerous documents on behalf of TFT Holdings, the listed general partner of TFT #1, TFT #2, TFT #3, TFT #4, TFT Chateau Lafitte-WJT, and TFT

Somerset-WJT, as its "manager", "authorized manager", and "sole manager", and he was the sole manager of TFT Galveston Portfolio during the period at issue.

*Petitioners' Financial Information*

During the period at issue, petitioners employed Galen Mansee, a certified public accountant, to perform accounting services, including gathering of data from apartment managers, payment of all bills approved by Mr. Teachworth, bank reconciliations, and preparation of tax returns for the partnerships and Mr. and Mrs. Teachworth.

Petitioners maintained and used a commercial checking account funded entirely by Mr. Teachworth. All expenses for the apartment properties and all payments to petitioners' workers were approved by Mr. Teachworth and were made from that account. Mr. Teachworth provided all the information and coding for the general ledger entries prepared by Mr. Mansee. Following the transfer of the Chateau Lafitte and Somerset Retirement Village complexes to TFT Chateau Lafitte-WJT and TFT Somerset-WJT, respectively, Mr. Mansee continued maintaining the same general ledgers he had previously used for TFT #2 and TFT #4.

*Petitioners' Workers*

The workers for petitioners during the period at issue fall within four groups: (1) apartment managers and leasing agents, (2) security personnel, (3) a maintenance supervisor, and (4) general maintenance workers. The general maintenance workers performed a variety of tasks including appliance and air conditioning maintenance, cleanup, landscape maintenance, drywall repairs, painting, roof maintenance, carpentry, and general miscellaneous maintenance.

*The Apartment Managers*

During the period at issue Mr. Teachworth hired all the apartment managers. They were not required to submit bids or fill out any applications before securing their positions. Nor did the managers sign written agreements for the work they performed.

Mr. Teachworth established the management office's hours of operation for each of the apartment properties, and he set

the hours that the managers were supposed to work. He also established the monthly salaries that were paid to the apartment managers, along with nominal performance-based bonuses. Further, the apartment managers were provided onsite housing and had their utilities expenses paid as part of their compensation.

Mr. Teachworth established all the managers' duties, leaving them with little to no discretion in how services were to be performed. They had to consult with Mr. Teachworth when determining how to handle vacancies at the apartment properties and had to seek approval to return security deposits to departing tenants. He established the community rules and regulations, and the rent for the properties. The managers could not change policies without his approval.

Mr. Teachworth provided the apartment managers with the office supplies and equipment required to perform their duties. He reimbursed them for expenses they incurred while performing their duties. He established a petty cash fund, which he monitored, to purchase office supplies and postage and for general office use. Finally, he would directly pay any replacement manager for the time worked in place of the normal manager.

Mr. Teachworth supervised all aspects of the apartment managers' work. He had to approve the managers' time off requests, and he could fire them at any time. During the period at issue none of the managers worked at any properties that were not owned by Mr. Teachworth.

### The Maintenance Supervisor

During the period at issue petitioners employed Jerrell Adams as the maintenance supervisor for the apartment properties. In that capacity he performed general repairs and any required maintenance project. He also supervised all the other maintenance workers. He was not required to submit a bid or fill out an application before securing his position. Mr. Adams did not enter into a written agreement for the work he performed. He was paid a monthly salary.

Mr. Teachworth was Mr. Adams' supervisor with regard to the services he performed for petitioners. Mr. Teachworth had to approve any maintenance work and expenditures that were not routine. During the period at issue Mr. Adams provided full-time services to petitioners. He averaged around 50

hours per week on the job. Additionally, he was on call 24 hours a day, 7 days a week.

Mr. Adams was never personally at risk of losing money by working for petitioners because Mr. Teachworth maintained accounts with Home Depot, Maintenance Warehouse, and Chalmers Hardware that were used to purchase materials and supplies required to perform his job. Additionally, he was reimbursed for any expenses he incurred performing his duties as maintenance supervisor. However, Mr. Adams supplied some of his own hand tools and equipment including saws, a sewer machine, spray rigs, a welder, and scaffolding. Mr. Teachworth directly paid any replacement maintenance supervisor for the time worked in place of Mr. Adams.

In addition to the standard duties Mr. Adams performed for petitioners, he established a business called Circle A through which he performed occasional maintenance services for Exact Realty, a property management company, and for petitioners during the period at issue. However, the services provided to petitioners through Circle A were separate and distinct from the typical services he performed for petitioners.

### The Maintenance Workers

During the period at issue petitioners employed numerous maintenance workers for general maintenance of the apartment properties. Those workers were not required to submit bids or fill out applications before securing their positions. Nor did they have written agreements for the work they performed. The workers were hired by either the maintenance supervisor or the apartment managers, but Mr. Teachworth had the final approval over all hiring decisions. Their hours were set by Mr. Adams, and they could be fired at any time. For their work, the maintenance workers were paid an hourly rate, with Mr. Teachworth having final approval on that rate.

The maintenance workers were never personally at risk of losing money by working for petitioners, because the materials used in performing their services for petitioners were provided by Mr. Teachworth. All the maintenance workers were supervised by Mr. Adams. They mostly worked at the same apartment complex each day unless one of the complexes had a project requiring more workers.

*The Security Workers*

During the tax years 2000 and 2001 The Seasons Resort apartment complex had security workers. The Somerset Retirement Village had security workers for all of 2000 and the first two months of 2001. Mr. Teachworth hired the security workers, and they reported to him and the apartment managers where they worked. Their hours were set by Mr. Adams and Mr. Teachworth, but the amount they were paid was determined solely by Mr. Teachworth. None of the security workers were off-duty police officers during the period at issue, and their presence was included in the advertisements and was a selling point for the apartment complexes.

*Federal Tax Filings*

TFT #1, TFT #2, TFT #3, TFT #4, TFT Chateau Lafitte-WJT, and TFT Somerset-WJT all filed Forms 1065 for the period at issue. TFT Galveston Portfolio did not. However, none of the six partnerships filed any Forms 941, Employer's Quarterly Federal Tax Return, or Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, for the period at issue. Nor did they file or furnish any Forms 1099–MISC, Miscellaneous Income, to any of the workers in question. Petitioners did not deposit employment taxes for the relevant periods. Respondent previously audited the Forms 1065 of petitioners for the period at issue, at which time respondent learned of petitioners' treating the workers in question as independent contractors and deducting their compensation accordingly on Forms 1065. Because the IRS had not received any Forms 940 and 941 from petitioners, IRS employees prepared substitutes for returns (SFRs) in accordance with the authority provided by section 6020(b).

*Notices*

On October 11, 2011, respondent issued a notice of determination to TFT Galveston Portfolio in which he determined that (1) workers listed in Table 1 attached to the notice were to be treated as petitioner's employees, (2) petitioner was not entitled to relief under the Revenue Act of 1978 (RA '78), Pub. L. No. 95–600, sec. 503(a), 92 Stat. at 2885, as amended, and (3) petitioner was liable for income tax withholding, FICA and FUTA taxes, the section 6651(a)(1) and (2)

additions to tax, and the section 6656 penalty for failure to make deposit of taxes for the period at issue.

Between September 29 and October 13, 2011, respondent issued an additional six separate notices of determination to TFT Galveston Portfolio as successor in interest to TFT #1, TFT #2, TFT #3, TFT #4, TFT Chateau Lafitte-WJT, and TFT Somerset-WJT, in which he determined that (1) workers listed in Table 1 attached to each notice were to be treated as petitioner's employees, (2) petitioner was not entitled to relief under RA '78 sec. 530(a), and (3) petitioner was liable for income tax withholding, FICA and FUTA taxes, the section 6651(a)(1) and (2) additions to tax, and the section 6656 penalty for failure to make deposit of taxes for the period at issue.

Petitioner filed timely petitions challenging the determinations.

OPINION

I. *Jurisdiction*

Under section 7436(a) this Court has jurisdiction to determine (1) whether an individual providing services to a "person" is that person's employee, (2) whether the person, if in fact an employer, is entitled to relief under RA '78 sec. 530, and (3) the correct amount of employment taxes which relate to the Commissioner's determination concerning worker classification. *Charlotte's Office Boutique, Inc. v. Commissioner*, 121 T.C. 89, 102–103 (2003), *aff'd*, 425 F.3d 1203 (9th Cir. 2005). Section 7701(a)(1) provides that "[t]he term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." Respondent issued notices of determination to TFT Galveston Portfolio determining that the individuals in question were TFT Galveston Portfolio's employees and that TFT Galveston Portfolio owes employment taxes, additions to tax, and penalties with respect thereto; and TFT Galveston Portfolio filed a timely petition in response. Therefore, we have jurisdiction to hear the challenge to respondent's determinations.

II. *Successor in Interest*

The structure of petitioner and the other six partnerships is, for the most part, uncontested, as demonstrated by the extensive stipulations of those facts. The issue before the Court is whether successor liability should be imposed on TFT Galveston Portfolio as the successor in interest to TFT #1, TFT #2, TFT #3, TFT #4, TFT Chateau Lafitte-WJT, and TFT Somerset-WJT. TFT Galveston Portfolio's liability for the employment tax, additions to tax, and penalties determined with respect to TFT Galveston Portfolio as successor in interest to the other six partnerships will turn on this decision. [6]

A successor in interest is "[o]ne who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance." Black's Law Dictionary 1570 (9th ed. 2009). Successor liability relies on two policy goals: "compensating plaintiffs as if the damage-causing business had not terminated; and preventing the rule of successor liability from otherwise reducing the free transferability of firms or their assets." Mark J. Roe, "Mergers, Acquisitions, and Tort: A Comment on the Problem of Successor Corporation Liability", 70 Va. L. Rev. 1559, 1561–1562 (1984). The Government may rely on the successor liability doctrine to hold a successor corporation liable for the tax debts of its predecessor. *See Atlas Tool Co. v. Commissioner*, 614 F.2d 860, 871 (3d Cir. 1980), *aff'g* 70 T.C. 86 (1978). Further, if permitted by State law, successor liability may be asserted when a partnership transfers its assets to another entity. *See Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) ("'The traditional rule of corporate successor liability and the exceptions to the rule are generally applied regardless of whether the predecessor or successor organization was a corporation or some other form of business organization.'" (quoting 63 Am. Jur. 2d, Products Liability, sec. 117 (1984))). [7]

---

[6] Respondent is arguing liability only under the theory of successor in interest and not under sec. 6901, providing for transferee liability, as respondent did not issue notices of transferee liability to TFT Galveston Portfolio.

[7] *See also* IRS CCA 200840001 (Oct. 3, 2008) (discussing the IRS' ability

Continued

A. *Application of Federal Common Law*

Respondent argues that because the uniform imposition and collection of employment taxes is a significant Federal interest, we should disregard State law and adopt the broader parameters of Federal common law in determining successor liability in employment tax cases.

The application of Federal common law in a novel context requires "'a significant conflict between some federal policy or interest and the use of state law'". *Atherton v. FDIC*, 519 U.S. 213, 218 (1997) (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)). The Supreme Court cautioned against the creation of Federal common law, noting that "'cases in which judicial creation of a special federal rule would be justified * * * are * * * "few and restricted".'" *Id.* at 218 (quoting *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963)). The Court further directed that "'[w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress,'" not the Federal courts. *Id.* (quoting *Wallis*, 384 U.S. at 68).

We have not found a significant conflict between a Federal policy or interest and the use of State law that would justify the adoption of Federal common law in this context. Respondent contends that "[t]he uniform imposition and collection of employment taxes is a significant federal interest justifying the application of a uniform federal approach." However, the Supreme Court has specifically rejected uniformity as a sufficient reason for adopting Federal common law. *See, e.g.*, *Atherton*, 519 U.S. at 219–220; *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979). Further, courts have rejected the application of Federal common law in tax cases in similar contexts. *See, e.g.*, *Commissioner v. Stern*, 357 U.S. 39 (1958); *Whelco Indus. Ltd. v. United States*, 526 F. Supp. 2d 819 (N.D. Ohio 2007); *Stramaglia v. United States*, 2007 WL 4404185 (E.D. Mich. 2007), *aff'd*, 377 Fed. Appx. 472 (6th Cir. 2010).

As support for his theory, respondent has offered a number of cases where courts have adopted Federal common law in determining successor liability. However, these decisions

to collect employment tax from a multimember LLC taxed like a partnership).

seem to be grounded in either environmental liability (i.e., CERCLA) or labor law (i.e., ERISA) and appear to have little or no application outside of those contexts. The only case to which respondent invites our attention involving the application of Federal common law successor liability in an employment tax context is *Today's Child Learning Ctr. Inc. v. United States*, 40 F. Supp. 2d 268 (E.D. Pa. 1998). In that case, the court held that Today's Child was the "mere continuation and/or successor in interest" of the original taxpayer, Wee Care. However, because the court's analysis of the "Continuation/De Facto Merger/Successor in Interest" theories was essentially one inquiry and its use of the term "successor in interest" was not necessary to its decision, we are not persuaded by its holding. *Cf., e.g.*, *Storage & Office Sys., LLC v. United States*, 490 F. Supp. 2d 955, 963–964 (S.D. Ind. 2007) (also distinguishing *Today's Child* for purposes of similar Federal common law argument).

Finally, respondent contends that "[i]f federal common law is not applied, it could encourage taxpayers subject to Texas law to use a similar structure to easily avoid the payment of employment taxes * * * [thereby] thwarting the Service's crucial function of enforcement and collection of federal employment taxes." Respondent further contends that "other states could be persuaded to modify their laws to reject the de facto merger or mere continuation exceptions and further frustrate the collection of federal taxes."

Respondent's fear of the potential for manipulation is unfounded. None of these concerns are present here, and no evidence was put forth tending to show that the concerns will be present. There is no evidence that petitioner's business structure was anything other than a valid reorganization.

More importantly, successor in interest liability is only one procedure by which the Commissioner may collect taxes from a successor who received assets from a taxpayer who owed the taxes. On brief respondent concedes that he could have potentially applied transferee liability against petitioner under section 6901 by issuing Notices of Determination Concerning Worker Classification to the other six partnerships, assessing the resulting liabilities, and then issuing a Notice of Transferee Liability to TFT Galveston Portfolio. Additionally, respondent could have potentially attempted to collect directly from Mr. Teachworth as a "responsible person"

under section 6672. Thus, our decision against applying Federal common law successor rules and holding that TFT Galveston Portfolio is not a successor in interest to the six partnerships listed on the notices does not by itself thwart respondent's crucial function of collecting Federal employment taxes. Accordingly, we do not accept respondent's suggestion that we adopt a Federal common law to override Texas law.

## B. *Application of State Law*

Successor liability is generally determined by State law. *LiButti v. United States*, 178 F.3d 114, 124 (2d Cir. 1999). As we have discussed above, we do not accept respondent's suggestion of applying Federal common law in this case; therefore we will apply the applicable State law.[8] Because TFT Galveston Portfolio and its alleged predecessors were all organized in Texas, we look to Texas law to determine whether TFT Galveston Portfolio is a successor in interest to the other partnerships.

Under Texas law "a person acquiring property * * * may not be held responsible or liable for a liability or obligation of the transferring domestic entity that is not expressly assumed by the person." Tex. Bus. Orgs. Code Ann. sec. 10.254(b) (West 2012).[9] In a majority of States that have a similar rule, four well-recognized exceptions impose liability on an acquiring company. The first is similar to that codified above in the Texas Business Organizations Code. The three other exceptions are as follows: (1) when the transaction amounts to a de facto merger; (2) when the successor is a mere continuation of the seller company; and (3) when the transaction is entered into fraudulently to escape liability.

---

[8] This Court generally follows State law to determine the legal interests and rights of the taxpayer. *See, e.g.*, *United States v. Mitchell*, 403 U.S. 190 (1971); *Commissioner v. Stern*, 357 U.S. 39 (1958); *Morgan v. Commissioner*, 309 U.S. 78 (1940).

[9] The Texas Business Organizations Code was adopted in 2003. *See* H.B. No. 1156, 2003 Tex. Sess. Law Serv. ch. 182 (H.B.1156) (Vernon). Its predecessor contained substantially similar language. *See* Tex. Bus. Corp. Act, art. 5.10 (expired Jan. 1, 2010); *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, 635 F.3d 734, 737 (5th Cir. 2011). Because there is no substantive difference between the statutes, the Court refers to the currently enacted version of the law for the sake of convenience, and it does not decide which version of the statute would apply.

*See, e.g.*, *Lyon v. S. Gas Co. (In re Wright Enters.)*, 77 Fed. Appx. 356, 366–367 (6th Cir. 2003); *Cyr v. B. Offen & Co.*, 501 F.2d 1145, 1152 (1st Cir. 1974); *Pulis v. U.S. Elec. Tool Co.*, 561 P.2d 68, 69 (Okla. 1977). In Texas, however, de facto mergers are considered to be against public policy. *See, e.g.*, *McKee v. Am. Transfer & Storage*, 946 F. Supp. 485, 486–487 (N.D. Tex. 1996); *Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 756–759 (Tex. App. 13th 1986, writ ref'd n.r.e.). Texas courts have also refused to apply the doctrine of mere continuation. *See, e.g.*, *Med. Designs, Inc. v. Shannon, Gracey, Ratliff & Miller, L.L.P.*, 922 S.W.2d 626 (Tex. Ct. App. 2d 1996); *Mudgett*, 709 S.W.2d at 758 ("Certainly if the de facto merger doctrine is contrary to the public policy of our state, so must be the mere continuation doctrine."). Lastly, there is some dispute in Texas courts as to whether Texas recognizes a fraudulent transfer exception to the general rule of successor nonliability. *See In re 1701 Commerce, LLC*, 511 B.R. 812, 823–825 (Bankr. N.D. Tex. 2014). *But see Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, 2010 WL 1417900, at \*6 (S.D. Tex. 2010), *aff'd*, 635 F.3d 734 (5th Cir. 2011).[10] Thus, in Texas, an acquiring entity is not a successor in interest unless it expressly agrees to assume the liabilities of the other party in the transaction.

TFT Galveston Portfolio did not expressly assume the liabilities of the other six partnerships. Accordingly, under Texas law, TFT Galveston Portfolio is not a successor in interest to the six partnerships listed on the notices.

III. *Classification of Workers*

Sections 3111 and 3301 impose taxes on employers under the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA). Section 3101 imposes on employees under FICA a tax based on their wages paid, which the employer is required to collect under section 3102. Under sections 3402 and 3403, employers are liable for withholding from their employees' wages the employees' shares of Federal income tax.

In addition to the successor in interest liabilities, respondent determined that TFT Galveston Portfolio's

---

[10] We find that even if Texas does accept the fraud exception, there is no evidence to support its application here.

workers were employees for purposes of employment taxes and thus that TFT Galveston Portfolio is liable for withholding the proper amounts of tax under sections 3101, 3111, 3301, and 3402. TFT Galveston Portfolio challenges respondent's classification of the individuals listed in the notice of determination as employees.[11] TFT Galveston Portfolio maintains that these individuals were independent contractors and thus it was not responsible for withholding employment taxes.

A. *Burden of Proof*

We presume that a worker classification determination made by the Commissioner is correct, but a taxpayer may rebut that presumption by demonstrating by a preponderance of the evidence that the determination was erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Boles Trucking, Inc. v. United States*, 77 F.3d 236, 239–240 (8th Cir. 1996) (applying this standard to a worker classification determination); *Ewens & Miller, Inc. v. Commissioner*, 117 T.C. 263, 268 (2001).

B. *Common Law Test*

Whether an employer-employee relationship exists in a particular situation is a question of fact. *Weber v. Commissioner*, 103 T.C. 378, 386 (1994), *aff'd per curiam*, 60 F.3d 1104 (4th Cir. 1995). For the purposes of employment taxes, the term "employee" includes "any individual who, under the

---

[11] Because we hold that petitioner is not a successor in interest to the other six partnerships, the following analysis pertains only to the workers listed on the notice sent to petitioner on October 11, 2011, for the fourth quarter of tax year 2004. These include Jerry Adams (maintenance supervisor); Johnny Puentes, Robert Thorpe, Francisco Cedillo, Jaime Rosales, Roller Delgado, Hector Martinez, Joel Romero, John Russo, Ron Baltrusk, Francisco Flores, Joshua Wagner, Allen Jacobs, Oscar Loir (collectively, maintenance workers); Lestie Adams, Kelli Grant, Cheryl Mohr, Jason Wolfe, Kelli Grant, Christina Gerrior, Kimberly Wilkins, Linda Bradley, Randi Jensen (collectively, apartment managers).

With respect to the other names listed on the notice, such as Elizabeth Bonds, Delores Guamelo, Eric Puentes, Carla Carcano, Maria Martinez, Karla Carcano, Melinda Ruiz, Anita Jones, and Bobby Harris, respondent concedes that they were not petitioner's employees during the period at issue and payments made to them did not subject TFT Galveston Portfolio to employment tax liabilities.

usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". Sec. 3121(d)(2); *accord* sec. 3306(i); *Ewens & Miller, Inc. v. Commissioner*, 117 T.C. at 269.

Section 31.3121(d)–1(c)(2), Employment Tax Regs., defines the common law employer-employee relationship as follows:

> Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. * * *

In deciding whether a worker is a common law employee or an independent contractor, this Court considers: (1) the degree of control exercised by the principal; (2) which party invests in the work facilities used by the individual; (3) the opportunity of the individual for profit or loss; (4) whether the principal can discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship that the parties believed that they were creating. *Weber v. Commissioner*, 103 T.C. at 387. All of the facts and circumstances of each case are considered, and no single factor is dispositive. *Id.*

While no single factor is dispositive, the degree of control exercised by the principal over the details of the individual's work is one of the most important factors in determining whether a common law employment relationship exists. *See, e.g.*, *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003); *Leavell v. Commissioner*, 104 T.C. 140, 149 (1995). All that is necessary however, is that the prin-

cipal have the right to control the details of the individual's work. *Ewens & Miller, Inc. v. Commissioner*, 117 T.C. at 270.

C. *Analysis*

1. *Degree of Control*

The principal's degree of control over the details of the agent's work is one of the most important factors in determining whether an employment relationship exists. *See Clackamas Gastroenterology Assocs., P.C.*, 538 U.S. at 448; *Weber v. Commissioner*, 103 T.C. at 387. The degree of control necessary to find employee status varies according to the nature of the services provided. *Weber v. Commissioner*, 103 T.C. at 388. When the nature of the work is more independent, a lesser degree of control by the principal may still result in a finding of an employer-employee relationship. *Robinson v. Commissioner*, T.C. Memo. 2011–99, *aff'd*, 487 Fed. Appx. 751 (3d Cir. 2012).

TFT Galveston Portfolio, through Mr. Teachworth, controlled nearly every aspect of the work performed by the apartment managers. He unilaterally established the compensation paid to the managers, and he set their working hours and duties. In determining how to handle vacancies at the complexes the managers had to consult with Mr. Teachworth, and they had to gain his approval to return security deposits to departing tenants. He set the community rules and regulations and determined the rent at the properties, and the managers had no authority to alter the rents without his approval.

TFT Galveston Portfolio, through Mr. Teachworth, controlled the work performed by Mr. Adams. Because Mr. Adams was the maintenance supervisor, his duties included supervising the various maintenance workers, performing general repairs and maintenance, and executing large maintenance projects as needed. Mr. Adams had a small degree of latitude in his work. However, at trial he testified that he had to seek approval from Mr. Teachworth before performing any maintenance job that was not routine or small. Thus, the discretion allowed to Mr. Adams in performing his work was severely limited.

The maintenance workers, including those who performed more specialized or skilled work and those who provided tem-

porary services, were all supervised by Mr. Adams. Mr. Adams, along with the apartment managers, had the authority, delegated by Mr. Teachworth, to give instructions to any maintenance worker regarding what to do and how to do it. Mr. Adams, however, was ultimately responsible for making sure the maintenance jobs were completed. Additionally, Mr. Adams set the maintenance workers' hours and, if needed, could call workers from the various complexes to come help on a certain project. Ultimately though, all maintenance projects were subject to the final approval of Mr. Teachworth.

To retain the requisite degree of control over an employee, the employer need not direct the employee's every move; it is sufficient if he has the right to do so. *Weber v. Commissioner*, 103 T.C. at 387–388; *see* sec. 31.3401(c)–1(b), Employment Tax Regs. Although some of the workers had some latitude in how they performed their duties, ultimately Mr. Teachworth was the boss and had final authority on all the work performed at the properties. Accordingly, this factor weighs heavily towards a finding that TFT Galveston Portfolio's workers were in fact employees and not independent contractors.

2. *Investment in Facilities and Opportunity for Profit or Loss*

The fact that a worker has no investment in the facilities used in the work is indicative of an employer-employee relationship. *Ewens & Miller, Inc. v. Commissioner*, 117 T.C. at 271. Conversely, the fact that a worker provides his or her own tools generally indicates the worker is an independent contractor. *Id.* When workers have no opportunities for profit or loss, they are more like employees than independent contractors. *See D & R Fin. Servs., Inc. v. Commissioner*, T.C. Memo. 2011–252, slip op. at 10.

The workers had little, if any, financial investment in TFT Galveston Portfolio's business, and they were never at risk of suffering a personal financial loss. The work was all performed on site at the apartment properties. TFT Galveston Portfolio provided most of the office equipment and supplies used by the apartment managers and set up a petty cash fund to cover any incidental expenses incurred. The managers all received fixed salaries, with the exception of a small

performance-based bonus available to some of them. As part of their compensation, or as a condition of employment, the managers were provided with on-site housing and had their utilities expenses paid.

Mr. Adams, the maintenance supervisor, supplied some of his own tools and equipment; they were not purchased or used specifically or exclusively for TFT Galveston Portfolio's business. However, this factor alone is not determinative. In contrast, TFT Galveston Portfolio provided and paid for all the required maintenance materials through charge accounts Mr. Teachworth maintained at local hardware stores. Additionally, any incidental expenses the workers incurred were reimbursed by Mr. Teachworth.

Finally, the workers never had an opportunity for financial profit aside from their salaries. Although the maintenance workers could increase their earnings through working additional hours, they could not increase their hourly rate of pay, which was unilaterally set by Mr. Teachworth. Thus, the workers were never at risk of personal financial loss due to the services they provided. Accordingly, this factor weighs towards a finding that TFT Galveston Portfolio's workers were in fact employees and not independent contractors.

### 3. *Right To Discharge*

TFT Galveston Portfolio, through Mr. Teachworth, had the right to terminate the service of any of the workers at any time without financial penalties. The workers could also quit at any time. At no point did any of the workers enter into a contract or agreement that would bind TFT Galveston Portfolio or the workers. Accordingly, this factor weighs towards a finding that the workers were in fact employees and not independent contractors.

### 4. *Workers Part of Petitioner's Regular Business*

TFT Galveston Portfolio's sole business activity was the operation of the apartment properties. The workers all played a crucial role in its operation and financial success. The apartment managers' primary responsibility was to fill the vacancies, and the financial success of the properties depended on their maximizing the occupancy of the properties. The maintenance supervisor and the workers were tasked with responding to tenants' maintenance problems

and work orders. Thus, the workers all played an integral role in the business by keeping vacancies to a minimum, maintaining the physical integrity of the properties, and providing security, thereby preserving tenant satisfaction. *See Breaux & Daigle, Inc. v. United States*, 900 F.2d 49, 53 (5th Cir. 1990). Accordingly, this factor weighs towards a finding that the workers were in fact employees and not independent contractors.

5. *Permanency of Working Relationship*

A transitory work relationship may weigh in favor of independent contractor status. *Ewens & Miller, Inc. v. Commissioner*, 117 T.C. at 273. The evidence tends to show a continuing relationship between the workers and TFT Galveston Portfolio. Accordingly, this factor weighs towards a finding that the workers were in fact employees and not independent contractors.

6. *The Parties' Perception of the Relationship*

None of the workers had independent contractor agreements or written contracts. The workers did not submit bids for services. There is no evidence that any of the workers advertized their services to the public, nor did they work for any other companies during the period at issue. Although Mr. Adams occasionally performed maintenance and repair work outside of his job with TFT Galveston Portfolio, that work was done in his spare time and was not part of his full-time job, where he worked an average of 50 hours per week and was on call 24 hours a day, 7 days a week. That other work is not at issue.

Even if it was Mr. Teachworth's intention to create a legitimate independent contractor relationship with the workers, such an intention does not carry much weight when the common law factors compel a finding that an employer-employee relationship exists. *See Kumpel v. Commissioner*, T.C. Memo. 2003–265, slip op. at 14. Accordingly, this factor weighs towards a finding that TFT Galveston Portfolio's workers were in fact employees and not independent contractors.

7. *Conclusion*

After considering the record and weighing all of the factors, we conclude that the workers were employees during the period at issue. None of the relevant factors suggest that the workers were independent contractors, and many of the factors evidence an employer-employee relationship. For instance, the workers were all ultimately subject to the direction and control of Mr. Teachworth. He hired them and set their hours and wages. They had no financial investment in the work they performed. They bore no risk of financial loss, and they did not participate in TFT Galveston Portfolio's profits in any way. Finally, the fact that TFT Galveston Portfolio and Mr. Teachworth did not think they were creating an employment relationship with the workers is not persuasive when the common law factors weigh towards an employment relationship.

We think these factors sufficiently establish that the workers were properly classified as employees of TFT Galveston Portfolio. Therefore, we hold TFT Galveston Portfolio liable for the employment taxes determined for the fourth quarter of 2004 regarding the employees.

## IV. *Additions to Tax and Penalties*

### A. *Burden of Proof*

The Commissioner bears the burden of production with respect to an individual's liability for additions to tax and penalties. *See* sec. 7491(c). To meet that burden, the Commissioner must produce sufficient evidence indicating that it is appropriate to impose the penalty. *See Higbee v. Commissioner*, 116 T.C. 438, 446–447 (2001). However, section 7491(c) does not shift the burden of proof, which remains on the individual. *See Higbee v. Commissioner*, 116 T.C. at 446–447.

Section 7491(c) is not entirely instructive as to whether the section imposes the initial burden on the Commissioner when the taxpayer is an entity that has petitioned this Court under section 7436. By its terms, section 7491(c) applies only to the liability of "any individual" for penalties. [12] *See Palmer*

---

[12] In contrast, sec. 7491(a), which provides the general rule for shifting the burden of proof to the Commissioner in certain circumstances, applies

*Ranch Holdings Ltd. v. Commissioner*, T.C. Memo. 2014–79; *Palm Canyon X Invs., LLC v. Commissioner*, T.C. Memo. 2009–288; *Santa Monica Pictures, LLC v. Commissioner*, T.C. Memo. 2005–104.

We need not resolve any potential uncertainty; even if we assume that respondent has the initial burden of production, we are satisfied that he has carried it. Therefore, the burden remains with petitioner to prove the penalty determinations are incorrect. *See Higbee v. Commissioner*, 116 T.C. at 446–447.

B. *Additions to Tax*

Respondent determined that TFT Galveston Portfolio is liable for additions to tax under section 6651(a)(1) for its failure to file Forms 940 and 941, for employment taxes, for the period at issue and under section 6651(a)(2) for failure to pay the amount of tax shown on the SFRs. Section 6651(a)(1) imposes an addition to tax for failure to timely file a return unless the taxpayer shows that such failure was due to reasonable cause and not willful neglect. [13] Section 6651(a)(2) imposes an addition to tax for failure to pay the amount of tax shown on the return on or before the date prescribed unless the taxpayer can establish that the failure is due to reasonable cause and not due to willful neglect.

TFT Galveston Portfolio filed no employment tax return for the period at issue. Accordingly, we conclude that respondent produced sufficient evidence to show that the section 6651(a)(1) addition to tax is appropriate. Although the issues in this case are somewhat technical, TFT Galveston Portfolio has not produced any evidence demonstrating a good-faith effort to comply with the law and determine the correct treatment of the workers. Therefore, we find that the failure to file was not due to reasonable cause and hold TFT Galveston Portfolio liable for the section 6651(a)(1) addition to tax.

---

in ascertaining the liability of a "taxpayer."

[13] The addition to tax is equal to 5% of the amount of the tax required to be shown on the return if the failure to file is not for more than one month. An additional 5% is imposed for each month or fraction thereof in which the failure to file continues, to a maximum of 25% of the tax. The addition to tax is imposed on the net amount due. Sec. 6651(a)(1), (b); *Cabirac v. Commissioner*, 120 T.C. 163, 168 n.9 (2003).

As stated, TFT Galveston Portfolio did not file an employment tax return; however, respondent prepared a valid SFR under section 6020(b). Pursuant to section 6651(g)(2), an SFR is treated as the taxpayer's return for purposes of determining the section 6651(a)(2) addition to tax. Respondent presented evidence showing that TFT Galveston Portfolio did not make any tax payments during the period at issue. Accordingly, we conclude that respondent has produced sufficient evidence to show that the section 6651(a)(2) addition to tax is appropriate. TFT Galveston Portfolio has not produced sufficient evidence demonstrating that the failure to pay the appropriate amount was due to reasonable cause. Therefore, we hold TFT Galveston Portfolio liable for the section 6651(a)(2) addition to tax.

C. *Penalty Under Section 6656*

If a taxpayer is more than 15 days late in depositing employment taxes, section 6656 imposes a 10% penalty. Sec. 6656; *see also Ewens & Miller, Inc. v. Commissioner*, 117 T.C. at 268. The taxpayer is not liable for the section 6656 penalty if the late deposit was due to reasonable cause and not due to willful neglect. Sec. 6656(a). TFT Galveston Portfolio is liable for a penalty under section 6656. Respondent showed that TFT Galveston Portfolio did not deposit employment taxes. *See Ramirez v. Commissioner*, T.C. Memo. 2007–346 (finding that the IRS met its burden where section 7491(c) undisputedly applied by showing that the employer made no deposits). TFT Galveston Portfolio did not show that it had reasonable cause for failing to deposit employment taxes.

In reaching our holdings herein, we have considered all arguments the parties made, and to the extent we did not mention them above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing and the settled issues,

> *Decisions will be entered for petitioners in docket Nos. 29995–11, 30001–11, 682–12, 1175–12, 1180–12, and 1533–12.*

> *Decision will be entered under Rule 155 in docket No. 1082–12.*