T.C. Memo. 2018-87

UNITED STATES TAX COURT

HAMPTON SOFTWARE DEVELOPMENT, LLC, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30231-13L.            Filed June 19, 2018.

Brianna Tipton and Zachary K. Gregory, for petitioner.

G. Chad Barton, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  This case arises from a petition filed in response to a notice of determination concerning collection action(s) under section 6320 and/or 6330[1] that respondent's Appeals Office (Appeals Office) issued to petitioner (notice of determination).

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[*2]   In the notice of determination, respondent's Appeals Office determined that petitioner was precluded under section 6330(c)(2)(B) from challenging the underlying liabilities that respondent had assessed against petitioner for (1) respective employment taxes for the quarters ended on June 30, September 30, and December 31, 2009, and March 31, June 30, September 30, and December 31, 2010, (2) unemployment tax for 2010, and (3) respective additions under section 6651(a)(1) and (2) to and penalties under section 6656(a) on those respective taxes for those quarters.[2]  In Hampton Software Dev., LLC v. Commissioner, T.C. Memo. 2016-38, we held that petitioner was not precluded under section 6330(c)(2)(B) from challenging the underlying taxes at issue.

Petitioner disputes here the determination in the notice of determination sustaining a proposed levy to collect the underlying taxes at issue.[3]  In order to

---

[2]We shall refer collectively to the underlying tax liabilities that respondent had assessed against petitioner for (1) respective employment taxes for the quarters ended on June 30, September 30, and December 31, 2009, and March 31, June 30, September 30, and December 31, 2010, (2) unemployment tax for 2010, and (3) respective additions under sec. 6651(a)(1) and (2) to and penalties under sec. 6656(a) on those respective taxes for those quarters as the underlying taxes at issue.  We shall sometimes refer collectively (1) to the quarters ended on June 30, September 30, and December 31, 2009, and March 31, June 30, September 30, and December 31, 2010, as the quarters in question and (2) to the quarters in question and the year 2010 as the taxable periods in question.

[3]Petitioner also disputes the other determinations in the notice of determina-
(continued...)

**[*3]** resolve whether to sustain that determination, we must decide the following issues:

(1) Was Robert Herndon an employee or an independent contractor of petitioner for the quarters in question? We hold that Robert Herndon was an employee of petitioner.

(2) Although we have held that Robert Herndon was an employee of petitioner for the quarters in question, is petitioner nonetheless entitled to relief under section 530 of the Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. at 2885, as amended, for those quarters?[4] We hold that petitioner is not entitled to such relief.

(3) Is petitioner liable for the additions under section 6651(a)(1) and (2) to and the penalties under section 6656(a) on the respective employment taxes and unemployment tax for the taxable periods in question? We hold that petitioner is so liable.

---

[3](...continued)
tion that relate to the determination in that notice to sustain the proposed levy to collect the underlying taxes at issue. The only issues presented at trial and on brief relate to that latter determination.

[4]We shall refer to sec. 530 of the Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. at 2885 as section 530. We shall sometimes refer to the relief provided under section 530 as section 530 relief.

**[*4]**                                    FINDINGS OF FACT[5]

Some of the facts have been stipulated and are so found.

Petitioner had a mailing address in Broken Arrow, Oklahoma, at the time it filed the petition.

Petitioner is a limited liability company organized on September 19, 2005, under the laws of the State of Oklahoma. William Hampton and Brent Hampton were the sole owners of petitioner. (We shall sometimes refer collectively to William Hampton and Brent Hampton as the two owners. Our references to petitioner frequently are references to one or both of the two owners who were authorized to conduct petitioner's business.)

Petitioner was in the business of owning and operating the Orchard Park Apartments (apartment complex business), a 60-unit apartment complex in Tulsa, Oklahoma (apartment complex), which it had acquired and placed in service in July 2006. At the time of that acquisition, Robert Herndon (Mr. Herndon) was providing various services for the apartment complex to the former owner. Around the time petitioner acquired the apartment complex in July 2006, it retained Mr. Herndon to continue providing various services for that complex to petitioner, the

---

[5]Unless otherwise indicated, our findings of fact pertain to the years 2009 and 2010. We sometimes refer in our findings to the years 2009 and 2010 for clarity.

[*5] new owner. At the time of the trial in this case, Mr. Herndon was still providing various services for the apartment complex to petitioner.

Petitioner, as the owner and the operator of the apartment complex, established the amount of rent that it charged for each apartment at that complex. Petitioner also established the policies, rules, and/or regulations that were to apply at the apartment complex, such as policies on pets and rules or regulations governing the swimming pool at that complex. Only petitioner had the authority to change any policies, rules, and/or regulations that it had established for the apartment complex.

Petitioner maintained an office at the apartment complex (petitioner's office). Petitioner's office consisted of two apartments that had been modified to serve as petitioner's office. Petitioner had placed certain equipment and other items in that office for use in carrying on its apartment complex business, including a computer and a printer, a file cabinet for retaining tenant files, a book of blank rent receipts, a drop box for rent payments, a bank deposit bag for use by petitioner's two owners to take rent payments to its bank for deposit, blank rental application forms, and blank lease forms.

Mr. Herndon served as the property manager at the apartment complex for petitioner. He was the only person who performed work regularly at that complex

[*6] for petitioner. Mr. Herndon did not supervise any person whom petitioner retained from time to time to perform work at the apartment complex that Mr. Herndon was not qualified to handle.

From the time Mr. Herndon began working for petitioner in 2006 as the property manager at the apartment complex, he resided in an apartment at that complex, which was immediately adjacent to petitioner's office.

Petitioner directed Mr. Herndon to undertake, inter alia, the following work at the apartment complex, which included not only certain management types of work but also certain other types of work: (1) general maintenance work, such as (a) doing whatever routine work (e.g., routine plumbing work) was needed to maintain the apartments, (b) doing whatever work was needed in vacant apartments to make them suitable for the occupancy of new tenants (e.g., sheetrock repair, removing and replacing old carpet, and painting), (c) performing concrete and fence post repair work as needed for the area around the swimming pool, (d) mowing the lawn with petitioner's lawn mower, and (e) doing other work relating to the general maintenance of the apartment complex; (2) placing newspaper advertisements showing the availability of apartments for rent; (3) accepting applications to rent from prospective tenants; (4) showing apartments for rent to prospective tenants; (5) reviewing applications to rent from prospective tenants;

[*7] (6) deciding whether to accept or reject those applications by following the guidelines that petitioner had established for accepting or rejecting prospective tenants; (7) usually deciding whether to evict a tenant, although sometimes consulting with one of the two owners about whether to evict a tenant; (8) answering telephone calls made to petitioner's office when neither of the two owners nor Mr. Herndon was in that office, which, in that event, were automatically forwarded to Mr. Herndon's mobile telephone; and (9) processing rental payments received by (a) inputting into petitioner's computer in petitioner's office the status of rental payments, (b) using petitioner's bank stamp on rent payment checks for deposit to petitioner's bank account, (c) placing those stamped checks into a bank bag to be picked up by one of the two owners, (d) issuing receipts to tenants for rent paid, and (e) placing copies of those receipts in a so-called book of receipts that one of the two owners thereafter retrieved from petitioner's office.

In performing some of the general maintenance work at the apartment complex, Mr. Herndon used his own maintenance tools (e.g., hammer, saw, drill, and mud bucket for carpentry work or plumbing maintenance work).[6]

---

[6]As discussed below, Mr. Herndon also used the same tools that he owned and used at the apartment complex for some general maintenance work that he did for certain individuals who were not related to petitioner.

**[*8]** Pursuant to the work arrangement that Mr. Herndon had with petitioner, petitioner had the right to discharge him at any time, and he had the right to resign at any time. Pursuant to that arrangement, petitioner had the right to control or direct what work Mr. Herndon was to perform at the apartment complex and how he was to do that work.

Not only did petitioner have the right to control or direct what work Mr. Herndon was to perform at the apartment complex and how he was to do that work, it also exercised that right as follows. Petitioner directed or controlled what work Mr. Herndon was to perform at the apartment complex and how he was to do that work by, inter alia, giving him instructions as to what to do or what not to do; giving him instructions on how to do the work that he was directed to perform; giving him instructions specifying the dates on which it required Mr. Herndon to do certain work; prioritizing the work that it required Mr. Herndon to perform; giving him guidelines which the two owners discussed with him and which he was required to follow in performing most of the work for which he was responsible; and requiring Mr. Herndon to submit reports on the status of the nonroutine work that he was doing. To illustrate petitioner's control or direction of Mr. Herndon's work at the apartment complex, as discussed above, Mr. Herndon had to follow petitioner's guidelines for rejecting or accepting applications to rent from prospec-

[*9] tive tenants.[7]  In addition, Mr. Herndon had to ask petitioner for approval before incurring an expense for work at the apartment complex that exceeded an amount which petitioner had established in guidelines relating to work-related expenditures (sometimes, work-related expenditure guidelines).  As a further illustration of petitioner's control or direction of Mr. Herndon's work, petitioner asked Mr. Herndon from time to time to recommend a qualified person to perform work at the apartment complex that Mr. Herndon was not qualified to handle, but only petitioner had the authority to retain any person that Mr. Herndon recommended.

Petitioner generally did not closely supervise Mr. Herndon or did not supervise him at all in his performance of routine general maintenance work or minor tasks.  That is because as of 2009 and 2010 Mr. Herndon had served as the property manager at the apartment complex for petitioner and the former owner for a total of 12 to 13 years.  Consequently, he was thoroughly familiar with how to

---

[7]As of 2009 and 2010, Mr. Herndon had served as the property manager at the apartment complex for petitioner and for the former owner for a total of 12 to 13 years.  During that time, he became experienced in deciding whether to accept or reject applications to rent from prospective tenants by following the guidelines that he was required to follow in making those determinations.  Despite having petitioner's guidelines, Mr. Herndon was not always sure whether to approve or disapprove certain applications to rent from prospective tenants.  In those events, which occurred several times a month, he contacted one of the two owners and asked him whether he should approve or disapprove those applications.

[*10] perform, and experienced in performing, routine general maintenance work or minor tasks, and therefore petitioner generally did not have to supervise closely or supervise at all those types of work or tasks.

Each of the two owners visited the apartment complex separately a few times each week. During those visits, each of them went to petitioner's office and toured the apartment complex in order to determine, inter alia, what instructions to give to Mr. Herndon regarding work that each wanted him to do. If Mr. Herndon was not at the apartment complex when each of the two owners visited, each left him a note containing instructions regarding work that each wanted him to do.

Petitioner had a credit card in its name (petitioner's credit card) which it allowed Mr. Herndon to use, subject to its work-related expenditure guidelines, to purchase materials that he needed in order to perform general maintenance work at the apartment complex. Petitioner also gave Mr. Herndon a specified gasoline allowance by allowing him to use petitioner's credit card to purchase a specified amount of gasoline for his personal vehicle because Mr. Herndon used his personal vehicle not only for personal reasons but also for errands relating to work that he was doing at the apartment complex. Petitioner, not Mr. Herndon, was responsible for and paid all of petitioner's credit card charges.

[*11] Mr. Herndon was not qualified to handle all of the work required at the apartment complex. In the event work was required at that complex that Mr. Herndon was not qualified to handle, he contacted an independent service person to evaluate the nature and propose the cost of any such work. Mr. Herndon thereafter informed the two owners, who made the decision as to whether to have the work done by that independent service person.

Petitioner paid Mr. Herndon for his services at the apartment complex a total of $2,000 each month,[8] regardless of how many hours he worked or how successful petitioner's apartment complex business was. Petitioner did not expressly provide to Mr. Herndon any so-called paid vacation time. However, Mr. Herndon was able to take some time off from his work at the apartment complex when his schedule of work there permitted. In those instances, Mr. Herndon notified the two owners of the date(s) on which he planned to take off work at the apartment complex. Thus, petitioner paid Mr. Herndon for any time that he took off from his performing his duties at the apartment complex. Petitioner did not provide Mr. Herndon any additional benefits, such as health insurance, for his work at the apartment complex.

---

[8]Petitioner paid Mr. Herndon for his services at the apartment complex by issuing to him a check for $1,000 twice each month.

[*12] In addition to serving as the property manager at the apartment complex and performing the work that petitioner required him to do in that role, Mr. Herndon spent some time, often during evenings and on weekends, performing certain general maintenance work (e.g., painting) for certain individuals who lived in the neighborhood of that complex (sometimes, homeowners) and who were not related to petitioner.[9] (We shall sometimes refer to the general maintenance work that Mr. Herndon spent some time doing for certain homeowners as outside handyman work.) The outside handyman work was similar to the types of general maintenance work that Mr. Herndon did at the apartment complex. The compensation that Mr. Herndon received for any outside handyman work was established by his submitting a bid to the homeowner.

Petitioner did not issue Mr. Herndon Form 1099-MISC, Miscellaneous Income (Form 1099-MISC), or any other Form 1099, for his taxable year 2009.

For the quarters in question, petitioner did not file Form 941, Employer's Quarterly Federal Tax Return (Form 941), or pay over to the Federal Government (Government) employment taxes with respect to the compensation that it had paid Mr. Herndon during any of the quarters in question. Nor did petitioner file Form

---

[9]The record does not establish how much time Mr. Herndon spent doing outside handyman work.

[*13] 940, Employer's Annual Federal Unemployment (FUTA) Tax Return (Form 940), or pay over to the Government unemployment tax with respect to the compensation that it had paid Mr. Herndon during any of those quarters.

Respondent conducted an examination for petitioner's quarters in question and proposed to treat as wages the compensation that it had paid to Mr. Herndon throughout 2009 and 2010. As a result of that examination, respondent prepared a substitute for return for each Form 941 and each Form 940 that respondent's examiner had concluded petitioner was required to file because it had paid wages to Mr. Herndon.[10]

Respondent issued to petitioner a notice of determination of worker classification in which respondent determined that for each of the quarters in question (1) Mr. Herndon was an employee of petitioner; (2) petitioner is not entitled to section 530 relief; and (3) petitioner is liable for employment taxes, unemployment tax, additions to those taxes under section 6651(a)(1) and (2) and penalties on those taxes under section 6656(a). Thereafter, respondent assessed those employment taxes, unemployment tax, and additions to and penalties on those taxes. (We shall sometimes refer to the employment taxes, unemployment tax,

---

[10]The revenue agent prepared a substitute for Form 940 for not only 2010 but also for 2009. Form 940 for 2009 is not at issue. Our findings are limited to Form 940 and unemployment tax for 2010.

[*14] additions to and penalties on those taxes for the taxable periods in question, as well as interest as provided by law thereon, as petitioner's alleged unpaid liabilities.)

Respondent issued to petitioner a notice of intent to levy and notice of your right to a hearing with respect to petitioner's alleged unpaid liabilities (notice of levy).

Petitioner timely submitted to respondent Form 12153, Request for a Collection Due Process or Equivalent Hearing. Thereafter, the settlement officer conducted a hearing.

Respondent's Appeals Office issued the notice of determination to petitioner, in which it sustained the notice of levy to collect petitioner's alleged unpaid liabilities. The notice of determination stated in pertinent part:

> **Summary of Determination**
> Our determination is not to grant you relief under Internal Revenue Code (IRC) section 6330 from the proposed collection action. We could not reach an agreement, extend any relief to you, or even consider any alternatives to the proposed levy, because after you requested an appeal and a hearing was offered, you did not express an interest in collection alternatives. You were unable to challenge the liability during the hearing. Under these circumstances we can only sustain the levy by the Collection Division, finding it necessary and no more intrusive than necessary.
> Please see the attachment for further explanation.

An attachment to the notice of determination stated in pertinent part:

**[*15]**                                    <u>**Summary**</u>

You filed a request for a Collection Due Process (CDP) hearing under Internal Revenue Code (IRC) § 6330 following receipt of a CP297A, Notice of Intent to Levy and Notice of Your Right to a Hearing.  The Automated Collection System (ACS) Section at the Philadelphia Service Center issued the notice on July 8, 2013 via Certified Mail, Return Receipt Requested.  Your Form 12153 requesting a CDP hearing was received by ACS July 15, 2013.  Your request was timely as it was made within the 30-day period for requesting a CDP hearing[.]

You did not express an interest in entering into a collection alternative.  You were unable to challenge the liability during the Collection Due Process Hearing.  Therefore, no collection alternatives could be considered in lieu of the proposed levy.  The Settlement Officer's determination is based on the review of the available information in the administrative file.  The proposed levy action is the appropriate action in this case.

<u>**Brief Background**</u>

On September 13, 2013, the Settlement Officer mailed you a letter scheduling a telephone conference in this case on October 9, 2013 at 3:00pm Central Time.  The letter presented you the options of having a face to face conference at the Appeals office closest to you or having the conference by correspondence.  The letter requested you submit a completed Form 433-B, Collection Information Statement within 21 days from the date of the letter.  Due to the government shutdown, the Settlement Officer was not available for the scheduled telephone conference.  On October 21, 2013, the Settlement Officer mailed you a subsequent letter rescheduling the telephone conference for November 6, 2013 at 1:30pm Central Time.  The letter advised the previous information requested had not been submitted and gave you 14 additional days to submit that information and any other information you wished to be considered.  The telephone conference was held

**[\*16]** at the scheduled time.  However, the financial information requested was not submitted.

## Discussion and Analysis

IRC § 6320 & § 6330 taken together require the Service to:
- a)    Verify at the Hearing that the requirements of legal and administrative procedures have been met;
- b)    Adequately review specific issues raised by a taxpayer at a Hearing, and;
- c)    Balance the needs of the Service to efficiently collect the tax with the taxpayer's expectation that the proposed actions be no more intrusive than necessary.

## Verification of Legal and Procedural Requirements

The requirements of applicable law or administrative procedures have been met and the actions taken were appropriate under the circumstances.

\* The Settlement Officer verified through transcript analysis that an assessment was made on the applicable CDP notice periods based on examination assessments, and the notice and demand for payment letter was mailed to your last known address, within 60 days of the assessment, as required by IRC § 6303.  The Settlement Officer also verified through transcript analysis and review of a copy of the determination letter from the Office of Appeals; that you appealed the assessments, but the appeal was denied.

\* There was a balance due when the CDP notice was issued per IRC §§ 6330 and 6331(a).  There is still a balance due.\* IRC § 6331(a) provides that if any person liable to pay such tax within 10 days after notice and demand for payment, the Secretary is authorized to collect such tax by levy on the person's property.

\* IRC § 6331(d) requires that the Service notify a taxpayer at least 30 days before a Notice of Levy can be issued.  The transcripts of the

[*17] account and the administrative file show that this notice was mailed to you by certified mail.

* IRC § 6330(a) imposes the requirement that a taxpayer be given an opportunity for hearing before the Internal Revenue Service can levy on the taxpayer's property.

* You were given the opportunity to raise any relevant issues relating to the unpaid tax or the proposed levy action at the Hearing in accordance with IRC § 6330(c).

* The Settlement Officer verified the collection period allowed by statute to collect these taxes has been suspended by the appropriate computer codes for the tax periods at issue.

* There is no offer-in-compromise or installment agreement pending or currently in effect. There is also no pending innocent spouse request.

* There is no pending bankruptcy case, nor did you have a pending bankruptcy case at the time the CDP notice was sent (11 U.S.C. § 362(a)(6)).

* This Settlement Officer has had no prior involvement with this taxpayer concerning the applicable tax period before this CDP case.

**Issues raised by the taxpayer:**

On Form 12153 requesting the Collection Due Process Hearing, the lien withdrawal box is checked. Attached to Form 12153 is a statement that you are revoking the power of attorney of your representatives from Greenspoon Marder law firm. Also attached are copies of previous correspondences sent to IRS (dated April 11, 2013, May 10, 2013, October 4, 2012 and December 28, 2011). In those correspondences, it states that at the conclusion of the negotiations, the Appeals Officer was fully aware of your intent to dispute the findings in Tax Court. It states you were waiting on written communication from the

[*18] Appeals Officer that either responded to your counter proposal or an explanation of his final determination, so that you could proceed to tax court. It explained you never received that communication after discussion in September/October of 2012. It says that the Appeals Officer asserts that you refused service of certified mail. You dispute that, stating if in fact a letter was sent via certified mail, you are not aware of it, but certainly did not refuse service. It also says your power of attorney was not representing you at the time. It explains that the Appeals Officer stated he sent a fax of the decision to you and the process for appealing to the tax court to the number on your January 2, 2013 communication to the Appeals Officer requesting status of the case. It states that fax was not received and the Appeals Officer has been unable to produce it. It states that regardless, you do not find this to be sufficient notice under the circumstances. It requests the IRS allow you your day in court, and provide notification to your office, and allow you 30 days to make the filing so you may proceed to tax court. The copies of the correspondence show the dispute was regarding whether someone was an employee or an independent contractor. It states you do not agree with the assessment of tax because you filed a tax return showing no employment taxes due. It further states the IRS created a tax return for you, for which you do not agree. It reiterates that you do not owe any taxes.

On September 13, 2013, the Settlement Officer mailed you a letter scheduling a telephone, conference in this case on October 9, 2013 at 3:00pm Central Time. The letter presented you the options of having a face to face conference at the Appeals office closest to you or having the conference by correspondence. The letter requested you send a completed Form 433-B, Collection Information Statement.

Due to the government shutdown, the Settlement Officer was not available for the scheduled telephone conference. On October 21, 2013, the Settlement Officer mailed you a subsequent letter rescheduling the telephone conference for November 6, 2013 at 1:30pm Central Time. The letter advised the previous information requested

[*19] had not been submitted and gave you 14 additional days to submit that information and any other information you wished to be considered.

During the telephone conference on November 6, 2013, you explained you had been opposed to the amounts due from the beginning. You reiterated the issue concerning whether or not the person that worked for you was an employee or an independent contractor. You maintain that person was an independent contractor. You explained you met with the IRS locally and also had dealings with the IRS over the phone. You then reiterated the issue of not having a chance to go to tax court. The Settlement Officer informed you that the Office of Appeals previously made a determination and issued a letter which gave you the right to go to tax court. You stated the letter was never received. The Settlement Officer explained it was issued to the business address at the time via certified mail on October 23, 2012, but was returned unclaimed. You stated no one at the office ever saw it and they did not receive notice of attempted delivery. The Settlement Officer advised that upon return to the IRS, the envelope shows there were 3 attempts to deliver the letter. You were adamant about having the chance to go to tax court and stated you were told that you would have to wait to request a Collection Due Process Hearing. The Settlement Officer explained that since the liability issue had previously been raised with the Office of Appeals and a determination was made, it could not be raised during the Collection Due Process Hearing. You asked what the hearing is for. The Settlement Officer advised that it is to determine if the Final Notice of Intent to Levy was appropriately issued and for consideration of collection alternatives. You asked if the Settlement Officer could consider a lesser amount. The Settlement Officer advised you were referring to an Offer in Compromise. The Settlement Officer explained the Office of Appeals does not have the authority to just settle for a lesser amount. The Settlement Officer informed you that based on your issue; you can submit an offer under the basis of Doubt as to Liability to the Internal Revenue Service. The Settlement Officer further informed you that you can obtain the appropriate form off of the website (irs. gov). You indicated that is what you are going to do. The Settlement

[*20] Officer explained the hearing request was timely, so enforced collection is suspended and will remain suspended for at least 60 days from date of this letter.  The Settlement Officer also explained this letter gives you the right to petition the tax court if you disagree with the Settlement Officer's determination.

You gave your new address to the Settlement Officer, explaining the office was now shut down and address of the company is now your residence.

## Other Issues Raised

You raised no other issues relating to the unpaid taxes.

## Collection Alternatives Offered by the Taxpayer

You did not express interest in collection alternatives.

## Balancing Need for Efficient Collection With Taxpayer Concern That the Collection Action Be No More Intrusive Than Necessary

The Settlement Officer balanced the competing interests in finding the proposed levy appropriate.  You expressed no interest in entering into a collection alternative during the Collection Due Process Hearing.  You were unable to challenge the liability during the hearing.  Therefore, no collection alternatives could be considered and the proposed levy balances the need for efficient collection with your concern that any collection action be no more intrusive than necessary[.]

OPINION

Petitioner bears the burden of proving for the quarters in question that Mr.

Herndon was an independent contractor, not an employee, of petitioner or that, in

**[\*21]** the alternative, it qualifies for relief under section 530.[11] See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); Boles Trucking, Inc. v. United States, 77 F.3d 236, 240 (8th Cir. 1996); Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 268 (2001).

We address first whether for the quarters in question Mr. Herndon was an employee, as respondent contends, or an independent contractor, as petitioner contends. Before considering that issue, we summarize briefly the context in which that issue arises.

Employers and employees are subject to so-called employment taxes under the Federal Insurance Contributions Act (FICA) and so-called unemployment tax under the Federal Unemployment Tax Act (FUTA). FICA imposes Social Security taxes and Medicare taxes on both employers and employees with respect to wages paid to employees. See secs. 3101(a), 3111(a). FUTA imposes unemployment tax on employers with respect to wages paid to employees. See sec. 3301.

---

[11]Sec. 7491(a) does not apply to employment tax disputes. See sec. 7491(a)(1); Charlotte's Office Boutique, v. Commissioner, 121 T.C. 89, 102 (2003), aff'd, 425 F.3d 1203 (9th Cir. 2005); Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 123 n.2 (2002), aff'd, 93 F. App'x 473 (3d Cir. 2004). Sec. 530 places the burden of proof on the Commissioner of Internal Revenue with respect to certain issues under sec. 530 where, inter alia, the taxpayer first establishes a prima facie case that it was reasonable not to treat an individual as an employee.

**[\*22]** Employers are required to withhold FICA tax and Federal income tax on wage payments that they make to their employees. See secs. 3102, 3402.

In determining whether an individual is an employee for employment tax purposes, section 3121(d)(2) provides that the term "employee" includes "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". The same definition applies in determining whether an individual is an employee for unemployment tax purposes. See sec. 3306(i).

Whether an individual is an employee or an independent contractor is a question of fact. See Weber v. Commissioner, 103 T.C. 378, 386 (1994), aff'd per curiam, 60 F.3d 1104 (4th Cir. 1995). In determining whether an individual who performs work (sometimes, worker) for another person (sometimes, principal) is an employee or an independent contractor, the courts have considered various factors, including the following: (1) the degree of control exercised by the person for whom the work is performed over the details of the work; (2) which party invests in the facilities used by the worker; (3) the opportunity of the worker for profit or the risk of the worker for loss; (4) whether the principal has the right to discharge the worker; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship between the principal and the

**[*23]** worker; (7) the relationship that the principal and the worker believed they were creating; and (8) whether the principal provided the worker any so-called employee benefits. See id. at 387, 392-393. In resolving the issue of whether a worker is an employee, all of the facts and circumstances must be considered, and no one factor is dispositive. See id. at 387.

Degree of Control

In general, the relationship of employer and employee exists under common law when the person for whom services are performed has the right to exercise control over the individual performing the services for that person with respect to not only the result to be accomplished but also the details and the means by which the result is accomplished. See id.; secs. 31.3121(d)-1(c)(2), 31.3306(i)-1(b), 31.3401(c)-1(b), Employment Tax Regs. We have referred to that right by the principal as the "crucial test" in determining whether an employer and employee relationship exists between the principal and the worker. See Weber v. Commissioner, 103 T.C. at 387; see also secs. 31.3121(d)-1(c)(2), 31.3306(i)-1(b), 31.3401(c)-1(b), Employment Tax Regs.

It is not required in order for an employer and employee relationship to exist that the person for whom the services are performed in fact control or direct the manner in which the individual performs the services for that person. In order for

**[\*24]** a principal to have the control necessary to find that a worker is an employee of that principal, the principal "need not stand over the * * * [worker] and direct every move made by that * * * [worker]." Weber v. Commissioner, 103 T.C. at 388.  It is sufficient for an employer and employee relationship to exist if the principal has the right to do so.  See id.; secs. 31.3121(d)-1(c)(2), 31.3306(i)-1(b), 31.3401(c)-1(b), Employment Tax Regs.

Nor is it necessary in order for an employer and employee relationship to exist that the principal establish the hours of the worker or supervise every detail of that worker's work environment.  See Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270.  That the worker establishes the hours that he/she works does not require a finding that the worker is not an employee of the principle.  See id.

In addition, the degree of control needed to find employee status varies depending upon the nature of the services provided.  See id.  When the nature of the work is more independent, a lesser degree of control by the person for whom the services are performed may still result in a finding of an employer and employee relationship.  See TFT Galveston Portfolio, Ltd. v. Commissioner, 144 T.C. 96, 116 (2015).

In the present case, petitioner, as the owner and the operator of the apartment complex, established the amount of rent that it charged for each apartment at

**[\*25]** that complex. Petitioner also established the policies, rules, and/or regulations that were to apply at the apartment complex, such as policies on pets and rules or regulations governing the swimming pool at that complex. Only petitioner had the authority to change any policies, rules, and/or regulations that it had established for the apartment complex.

Petitioner directed Mr. Herndon to undertake, inter alia, the following work at the apartment complex, which included not only certain management types of work but also certain other types of work: (1) general maintenance work, such as (a) doing whatever routine work (e.g., routine plumbing work) was needed to maintain the apartments, (b) doing whatever work was needed in vacant apartments to make them suitable for the occupancy of new tenants (e.g., sheetrock repair, removing and replacing old carpet, and painting), (c) performing concrete and fence post repair work as needed for the area around the swimming pool, (d) mowing the lawn with petitioner's lawn mower, and (e) doing other work relating to the general maintenance of the apartment complex; (2) placing newspaper advertisements showing the availability of apartments for rent; (3) accepting applications to rent from prospective tenants; (4) showing apartments for rent to prospective tenants; (5) reviewing applications to rent from prospective tenants; (6) deciding whether to accept or reject those applications by following the

**[*26]** guidelines that petitioner had established for accepting or rejecting prospective tenants; (7) usually deciding whether to evict a tenant, although sometimes consulting with one of the two owners about whether to evict a tenant; (8) answering telephone calls made to petitioner's office when neither of the two owners nor Mr. Herndon was in that office, which, in that event, were automatically forwarded to Mr. Herndon's mobile telephone; and (9) processing rental payments received by (a) inputting into petitioner's computer in petitioner's office the status of rental payments, (b) using petitioner's bank stamp on rent payment checks for deposit to petitioner's bank account, (c) placing those stamped checks into a bank bag to be picked up by one of the two owners, (d) issuing receipts to tenants for rent paid, and (e) placing copies of those receipts in a so-called book of receipts that one of the two owners thereafter retrieved from petitioner's office.

Pursuant to the work arrangement that Mr. Herndon had with petitioner, petitioner had the right to control or direct what work Mr. Herndon was to perform at the apartment complex and how he was to do that work.[12]  Not only did petitioner have the right to control or direct what work Mr. Herndon was to perform at the apartment complex and how he was to do that work, petitioner in fact directed

---

[12]Mr. Herndon acknowledged during his testimony at trial that petitioner had the right to control or direct what he was to do at the apartment complex.

[*27] or controlled what work Mr. Herndon was to perform at the apartment complex and how he was to do that work. It did so by, inter alia, giving him instructions as to what to do or what not to do; giving him instructions on how to do the work that he was directed to perform; giving him instructions specifying the dates on which it required Mr. Herndon to do certain work; prioritizing the work that it required Mr. Herndon to perform; giving him guidelines which the two owners discussed with him and which he was required to follow in performing most of the work for which he was responsible; and requiring Mr. Herndon to submit reports on the status of the nonroutine work that he was doing. To illustrate petitioner's control or direction of Mr. Herndon's work at the apartment complex, Mr. Herndon had to follow petitioner's guidelines for rejecting or accepting applications to rent from prospective tenants.[13] In addition, Mr. Herndon had to ask petitioner for approval before incurring an expense for work at the apartment complex that exceeded an amount which petitioner had established

---

[13]As of 2009 and 2010, Mr. Herndon had served as the property manager at the apartment complex for petitioner and for the former owner for a total of 12 to 13 years. During that time, he became experienced in deciding whether to accept or reject applications to rent from prospective tenants by following the guidelines that he was required to follow in making those determinations. Despite having petitioner's guidelines, Mr. Herndon was not always sure whether to approve or disapprove certain applications to rent from prospective tenants. In those events, which occurred several times a month, he contacted one of the two owners and asked him whether he should approve or disapprove those applications.

[*28] in guidelines relating to work-related expenditures. As a further illustration of petitioner's control or direction of Mr. Herndon's work, petitioner asked Mr. Herndon from time to time to recommend a qualified person to perform work at the apartment complex that Mr. Herndon was not qualified to handle, but only petitioner had the authority to retain any person that Mr. Herndon recommended.

Petitioner generally did not closely supervise Mr. Herndon or did not supervise him at all in his performance of routine general maintenance work or minor tasks. That finding does not undermine our findings that not only did petitioner have the right to control or direct what Mr. Herndon did at the apartment complex, but petitioner in fact directed or controlled what work Mr. Herndon performed at that complex. The discretion that petitioner allowed Mr. Herndon in performing any routine general maintenance work or minor tasks is not surprising given Mr. Herndon's extensive experience in doing that type of work at the apartment complex for petitioner and the former owner. See TFT Galveston Portfolio, Ltd. v. Commissioner, 144 T.C. at 116-117. During 2009 and 2010, Mr. Herndon had served as the property manager at the apartment complex for petitioner and the former owner for a total of 12 to 13 years. Consequently, he was thoroughly familiar with how to perform, and experienced in performing, routine general

**[*29]** maintenance work or minor tasks, and therefore petitioner generally did not have to supervise closely or supervise at all those types of work or tasks.

On the record before us, we find that the degree-of-control factor weighs in favor of finding that for the quarters in question Mr. Herndon was petitioner's employee.

Investment in Facilities

Where the worker has no investment in the facilities, such as tools, used in the work that the worker does for the principal, that fact generally is indicative that the worker is an employee of the principal.  See id. at 117.  Where the worker provides the worker's own tools, that fact generally is indicative that the worker is an independent contractor.  See id.

In the present case, Mr. Herndon used his own maintenance tools (e.g., hammer, saw, drill, and mud bucket for carpentry work or plumbing maintenance work) in performing some of the general maintenance work at the apartment complex.  Mr. Herndon also used those same maintenance tools in performing some outside handyman work, i.e., general maintenance work, for certain individuals who were not related to petitioner.  The outside handyman work was similar to the types of general maintenance work that Mr. Herndon did at the apartment complex.

[*30] Petitioner, however, owned and/or provided the facilities and most of the tools and equipment that Mr. Herndon used in performing his work at the apartment complex. Specifically, petitioner maintained an office at the apartment complex. Petitioner's office consisted of two apartments that had been modified to serve as petitioner's office. Petitioner had placed certain equipment and other items in that office for use in carrying on its apartment complex business, including a computer and a printer, a file cabinet for retaining tenant files, a book of blank rent receipts, a drop box for rent payments, a bank deposit bag for use by petitioner's two owners to take rent payments to its bank for deposit, blank rental application forms, and blank lease forms. Moreover, Mr. Herndon mowed the lawn at the apartment complex with petitioner's lawn mower. In addition, from the time Mr. Herndon began working for petitioner in 2006 as the property manager at the apartment complex, he resided in an apartment at that complex, which was immediately adjacent to petitioner's office.[14]

Petitioner also had a credit card in its name which it allowed Mr. Herndon to use, subject to its work-related expenditure guidelines, to purchase materials that he needed in order to perform general maintenance work at the apartment

---

[14]Although not altogether clear from the record, it appears that Mr. Herndon did not pay petitioner rent for that apartment.

[*31] complex. Petitioner also gave Mr. Herndon a specified gasoline allowance by allowing him to use petitioner's credit card to purchase a specified amount of gasoline for his personal vehicle because Mr. Herndon used his personal vehicle not only for personal reasons but also for errands relating to work that he was doing at the apartment complex. Petitioner, not Mr. Herndon, was responsible for and paid all of petitioner's credit card charges.

On the record before us, we find that the investment-in-facilities factor weighs in favor of finding that for the quarters in question Mr. Herndon was petitioner's employee.

Opportunity for Profit and Risk of Loss

Where the worker does not have an opportunity for profit or risk of loss in working for the principal, that fact generally is indicative that the worker is an employee of the principal. See TFT Galveston Portfolio, Ltd. v. Commissioner, 144 T.C. at 117. A negotiated flat fee paid to a worker (1) insulates the worker from suffering a loss if the cost of a project exceeds the amount budgeted as the cost of the project and (2) prevents the worker from realizing a profit if after completion of the project the actual cost is less than that budgeted amount. See Kurek v. Commissioner, T.C. Memo. 2013-64, at *12. A flat fee payment also

[*32] prevents a worker from increasing through the worker's efforts the earnings that the worker will receive for his/her work.  See id.

In the present case, petitioner paid Mr. Herndon for his services at the apartment complex a total of $2,000 each month,[15] regardless of how many hours he worked or how successful petitioner's apartment complex business was.

On the record before us, we find that the opportunity-for-profit or risk-of-loss factor weighs in favor of finding that for the quarters in question Mr. Herndon was petitioner's employee.

Right To Discharge the Worker

An employer typically has the right to terminate an employee at will.  See Ellison v. Commissioner, 55 T.C. 142, 155 (1970).

In the present case, pursuant to the work arrangement that Mr. Herndon had with petitioner, petitioner had the right to discharge him at any time, and he had the right to resign at any time.

On the record before us, we find that the right-to-discharge-the-worker factor weighs in favor of finding that for the quarters in question Mr. Herndon was petitioner's employee.

---

[15]Petitioner paid Mr. Herndon for his services at the apartment complex by issuing to him a check for $1,000 twice each month.

**[\*33]** <u>Integral Part of the Principal's Business</u>

Where the worker is an essential part of a principal's normal business operations, that fact generally is indicative that the worker is an employee of the principal. See <u>TFT Galveston Portfolio, Ltd. v. Commissioner</u>, 144 T.C. at 118.

In the present case, Mr. Herndon served as the property manager at the apartment complex for petitioner, the owner and operator of that apartment complex business. Mr. Herndon was the only person who performed work regularly at that complex for petitioner. Petitioner directed Mr. Herndon to undertake, inter alia, the following work at the apartment complex, which included not only certain management types of work but also certain other types of work: (1) general maintenance work, such as (a) doing whatever routine work (e.g., routine plumbing work) was needed to maintain the apartments, (b) doing whatever work was needed in vacant apartments to make them suitable for the occupancy of new tenants (e.g., sheetrock repair, removing and replacing old carpet, and painting), (c) performing concrete and fence post repair work as needed for the area around the swimming pool, (d) mowing the lawn with petitioner's lawn mower, and (e) doing other work relating to the general maintenance of the apartment complex; (2) placing newspaper advertisements showing availability of apartments for rent; (3) accepting applications to rent from prospective tenants; (4) showing apartments for

[*34] rent to prospective tenants; (5) reviewing applications to rent from prospective tenants; (6) deciding whether to accept or reject those applications by following the guidelines that petitioner had established for accepting or rejecting prospective tenants; (7) usually deciding whether to evict a tenant, although sometimes consulting with one of the two owners about whether to evict a tenant; (8) answering telephone calls made to petitioner's office when neither of the two owners nor Mr. Herndon was in that office, which, in that event, were automatically forwarded to Mr. Herndon's mobile telephone; and (9) processing rental payments received by (a) inputting into petitioner's computer in petitioner's office the status of rental payments, (b) using petitioner's bank stamp on rent payment checks for deposit to petitioner's bank account, (c) placing those stamped checks into a bank bag to be picked up by one of the two owners, (d) issuing receipts to tenants for rent paid, and (e) placing copies of those receipts in a so-called book of receipts that one of the two owners thereafter retrieved from petitioner's office. The work at the apartment complex that Mr. Herndon undertook on behalf of petitioner "played an integral role in the business [petitioner's apartment complex business] by keeping vacancies to a minimum, [and] maintaining the physical integrity of the propert[y]". TFT Galveston Portfolio, Ltd. v. Commissioner, 144 T.C. at 119.

[*35] On the record before us, we find that the integral-part-of-the-principal's-business factor weighs in favor of finding that for the quarters in question Mr. Herndon was petitioner's employee.

Permanency of the Relationship

Where the working relationship between the worker and the principal is a continuing, not a transitory, relationship, that fact generally is indicative that the worker is an employee of the principal.  See id.

In the present case, around the time petitioner acquired the apartment complex in July 2006 it retained Mr. Herndon to continue providing various services for that complex to petitioner, the new owner.  At the time of the trial in this case, Mr. Herndon was still providing various services for the apartment complex to petitioner.  In addition, from the time Mr. Herndon began working for petitioner in 2006 as the property manager at the apartment complex, he resided in an apartment at that complex, which was immediately adjacent to petitioner's office.[16]  See Twin Rivers Farm, Inc. v. Commissioner, T.C. Memo. 2012-184, 2012 WL 2533949, at *4.

---

[16]See supra note 14.

**[\*36]** On the record before us, we find that the permanency-of-the-relationship factor weighs in favor of finding that for the quarters in question Mr. Herndon was petitioner's employee.

Relationship the Parties Believed They Created

Where the principal and the worker intend to establish an independent contractor relationship, "such an intention does not carry much weight [in determining whether the worker is an independent contract or an employee] when the common law factors compel a finding that an employer-employee relationship exists." TFT Galveston Portfolio, Ltd. v. Commissioner, 144 T.C. at 119.

In the present case, neither of the two owners of petitioner was a witness at trial, which suggests to us that the respective testimonies of those owners would not have been favorable to petitioner's position.

As for Mr. Herndon's testimony, he did not expressly testify what relationship he intended to establish with petitioner when he began working for it in 2006. However, Mr. Herndon did testify, and we found, that, in addition to serving as the property manager at the apartment complex and performing the work that petitioner required him to do in that role, he spent some time, often during evenings and on weekends, performing certain general maintenance work or outside handyman work (e.g., painting) for certain individuals who lived in the neighborhood of

[*37] that complex and who were not related to petitioner.[17]  The outside handy-man work was similar to the types of general maintenance work that Mr. Herndon did at the apartment complex.  However, Mr. Herndon also testified that the compensation that he received for any outside handyman work was established by his submitting a bid to the homeowner.  The way in which Mr. Herndon was compensated for his outside handyman work is in marked contrast to the way in which petitioner compensated him (i.e., petitioner paid Mr. Herndon a fixed monthly amount of $2,000) for his services at the apartment complex.

On the record before us, we find that the relationship-the-parties-believed-they-created factor is a neutral factor in determining whether for the quarters in question Mr. Herndon was petitioner's employee.

Principal's Provision of Employee Benefits

Where the principal provides to the worker so-called employee benefits, that fact generally is indicative that the worker is an employee of the principal.  See Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270; Weber v. Commissioner, 103 T.C. at 387.

---

[17]The record does not establish how much time Mr. Herndon spent doing outside handyman work.

[*38] In the present case, petitioner did not provide Mr. Herndon any additional benefits, such as health insurance, for his work at the apartment complex. Although petitioner did not expressly provide to Mr. Herndon any so-called paid vacation time, Mr. Herndon was able to take some time off from his work at the apartment complex when his schedule of work there permitted. In those instances, Mr. Herndon notified the two owners of the date(s) on which he planned to take off work at the apartment complex. Thus, petitioner paid Mr. Herndon for any time that he took off from his performing his duties as property manager at the apartment complex.[18]

On the record before us, we find that the principal's-provision-of-employee-benefits factor is a neutral factor in determining whether for the quarters in question Mr. Herndon was petitioner's employee.

Based upon our examination of the entire record before us, we find that for the quarters in question Mr. Herndon was an employee of petitioner, not an independent contractor.

We consider now, in the alternative, whether petitioner is entitled to section 530 relief. Petitioner claims that relief only for the quarters ended on March 31,

---

[18]Moreover, it appears that petitioner provided Mr. Herndon the rent-free use of an apartment at the apartment complex. See supra note 14.

[*39] June 30, September 30, and December 31, 2010 (quarters in question in 2010). It does not claim section 530 relief for the quarters ended on June 30, September 30, and December 31, 2009.

Section 530(a)(1) provides a principal relief from employment taxes and unemployment tax where the relationship between the principal and the worker is an employer and employee relationship, provided that the principal satisfies all of the following requirements: (1) the principal has not treated the worker as an employee for any period; (2) the principal has consistently treated the worker as not being an employee in all tax returns for periods after December 31, 1978; and (3) the principal had a reasonable basis for not treating the worker as an employee. See Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 130 (2002), aff'd, 93 F. App'x 473 (3d Cir. 2004). (We shall sometimes refer to the three requirements that petitioner must satisfy in order to be entitled to section 530 relief as the section 530 requirements.)

Turning to the first of the section 530 requirements that petitioner must satisfy in order to be entitled to section 530 relief, petitioner must have consistently treated Mr. Herndon as an independent contractor in its tax returns by filing Form 1099-MISC, as required by section 6041(a) and 6041A(a). See Kurek v. Commissioner, at *15 (citing John Keller, Action Auto Body v. Commissioner,

[*40] T.C. Memo. 2012-62, 2012 WL 752076, at *6; secs. 1.6041-1(a)(1) and (2), 1.6041-6, Proced. & Admin. Regs.).

On the record before us, we find that petitioner has failed to carry its burden of establishing that it issued to Mr. Herndon Form 1099-MISC, or any other Form 1099, for his taxable year 2010.[19] On that record, we find that petitioner has failed to carry its burden of establishing that it satisfies the first of the section 530 requirements.

Although not necessary to our ultimate finding below, we also find on the record before us that petitioner has failed to carry its burden of establishing that for the quarters in question in 2010 it satisfies the third of the section 530 requirements. On brief, petitioner contends that "[t]he facts and circumstances surrounding the working relationship between [p]etitioner and Mr. Herndon support the reasonable belief that independent contractor status was the proper treatment of Mr. Herndon during the tax periods 03/31/2010, 06/30/2010, 09/30/2010, and 12/31/2010." On the record before us, we reject that contention. We found on that record certain facts and circumstances that required us to find that for the

---

[19]We have found on the record before us that petitioner did not issue Mr. Herndon Form 1099-MISC, or any other Form 1099, for his taxable year 2009.

[*41] quarters in question, including the quarters in question in 2010, Mr. Herndon was petitioner's employee.

Based upon our examination of the entire record before us, we find that petitioner has failed to carry its burden of establishing that for the quarters in question in 2010 it is entitled to section 530 relief.

We turn finally to the additions under section 6651(a)(1) and (2) to and the penalties under section 6656(a) on the respective employment taxes and unemployment tax for the taxable periods in question. Petitioner does not address those determinations in its simultaneous opening brief or its simultaneous answering brief.[20] We conclude that petitioner has abandoned advancing any arguments that respondent erred in determining that petitioner is liable for the additions to tax under section 6651(a)(1) and (2) and the penalties under section 6656(a) that are at issue.[21] See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003).

---

[20]Although it is by no means clear from petitioner's two briefs, petitioner may be willing to concede the determinations that it is liable for the additions to tax under sec. 6651(a)(1) and (2) and the penalties under sec. 6656(a) if we were to find, which we have, that for the quarters in question Mr. Herndon was an employee of petitioner and that it is not entitled to section 530 relief.

[21]Even if we had not concluded that petitioner abandoned advancing any arguments that respondent erred in determining that petitioner is liable for the additions to tax under sec. 6651(a)(1) and (2) and the penalties under sec. 6656(a), we would have found on the record before us that petitioner is liable for those

(continued...)

**[\*42]** We find on the basis of our conclusion that petitioner has abandoned the issue of petitioner's liability for the additions to tax under section 6651(a)(1) and (2) and the penalties under section 6656(a) that petitioner is liable for those additions to tax and those penalties for the taxable periods in question.[22]

_____

[21](...continued)
additions to tax and those penalties. That is because petitioner has failed to carry its burden of establishing that its failure to file under sec. 6651(a)(1), its failure to pay under sec. 6651(a)(2), and its failure to deposit under sec. 6656(a) were due to reasonable cause, not willful neglect.

[22]We allowed the parties the opportunity to provide us with their respective views on the issue of whether, in the light of Graev v. Commissioner, 149 T.C. __ (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016), sec. 6751(b)(1) applies to the additions to tax under sec. 6651(a)(1) and (2) and the penalties under sec. 6656(a), which they did in respective filings that they made.

With respect to the additions to tax under sec. 6651(a)(1) and (2), the parties are in agreement in their respective filings that sec. 6751(b)(1) does not apply to those additions to tax because of the exception in sec. 6751(b)(2)(A).

With respect to the penalties under sec. 6656(a), respondent (1) represented in one of respondent's filings that those penalties were manually calculated and (2) consequently concedes that sec. 6751(b)(1) applies to those penalties. The parties agree in their respective filings that sec. 7491(c) applies only "with respect to the liability of any individual" for, inter alia, any penalty and that therefore respondent does not have the burden of production under sec. 7491(c) for the penalties under sec. 6656(a) that respondent determined. The parties also agree in their respective filings that petitioner has the burden of proof and the burden of production with respect to the penalties under sec. 6656(a). Petitioner nonetheless argues that "[r]espondent would be the only party with access to these records [any records regarding the approval that sec. 6751(b)(1) requires] and, therefore, it would place an undue burden on * * * Petitioner to be required to produce internal documents of the Internal Revenue Service to prove a penalty assessed against them [sic] was proper." We agree with petitioner that "[r]espondent would be the

(continued...)

**[*43]** We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the parties' respective concessions,

<u>An appropriate decision will</u>

<u>be entered</u>.

---

[22](...continued)
only party with access to these records [any records regarding the approval that sec. 6751(b)(1) requires]". We disagree with petitioner that "it would place an undue burden on * * * Petitioner to be required to produce internal documents of the Internal Revenue Service to prove a penalty assessed against them [sic] was proper." That is because petitioner did not ask us to allow it (1) to conduct discovery in order to ascertain whether respondent has any records regarding the approval that sec. 6751(b)(1) requires with respect to the penalties under sec. 6656(a) and/or (2) to reopen the record in order to dispute that that approval occurred.